FILED
HARRISBURG, PA

APR 1 0 2020

PER _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex* *rel.* [ANONYMOUS],<br><br>      Plaintiffs,<br><br>v.<br><br>[ANONYMOUS],<br><br>  Defendants. | Docket No. 1:20- CV-599<br><br>**Filed In Camera And Under Seal In Accordance With The False Claims Act,**<br>**31 U.S.C. § 3730(b)(2)**<br><br>Do Not Place In Press Box<br>Do Not Enter On PACER<br><br>Jury Trial Demanded |

## FALSE CLAIMS ACT COMPLAINT

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| |
|---|
| THE UNITED STATES OF AMERICA, *ex rel.* JESSE M. POLANSKY, M.D., M.P.H., |
| Plaintiffs, |
| v. |
| GEISINGER HOLY SPIRIT; GEISINGER COMMUNITY MEDICAL CENTER; GEISINGER MEDICAL CENTER; SPIRIT PHYSICIAN SERVICES INC. |
| Defendants. |

**FALSE CLAIMS ACT COMPLAINT**

1.     Plaintiff Relator Jesse M. Polansky, M.D., M.P.H. brings this action on behalf of the United States of America against Geisinger Holy Spirit, Geisinger Community Medical Center, Geisinger Medical Center (the "Hospital Defendants"), and Spirit Physician Services Inc., (all together, "Defendants"), for violations of the federal False Claims Act (31 U.S.C. §§ 3729, *et seq.*) and the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) to recover all damages, civil penalties, and all other recoveries for violations of these statutes.

1

## PRELIMINARY FACTUAL STATEMENT

2.      From at least 2010 through 2015 and, on information and belief,

continuing to the present day, Defendants knowingly submitted and caused to

be submitted false and fraudulent observation and short stay inpatient claims

for payment to federally funded health programs, including Medicare,

TRICARE, and Pennsylvania Medical Assistance ("government programs").

3.      Reimbursements to hospitals for inpatient services ("inpatient")

under the relevant government programs are, in general, dramatically higher

than   reimbursements   for   outpatient   hospital   observation   services

("observation"), and reimbursements for observation are in turn substantially

higher than reimbursements for emergency room services ("outpatient").  For

example, inpatient services are in general reimbursed at four to five thousand

dollars more per claim than observation services.  The payment difference is

even more substantial for minor elective procedures such as cardiac stents.

4.      Defendants have falsely and fraudulently submitted claims that

failed to comply with government program requirements for hospital status

(*i.e.*, classification as inpatient or outpatient) by relying on fraudulent policies

and practices adopted from Executive Health Resources, Inc. ("EHR"), a

billing vendor retained by the Hospital Defendants.  EHR is part of Optum, a

business unit of United HealthGroup ("UHG").  In 2011, UHG purchased

EHR for over 1.5 billion dollars.  Defendants used EHR's fraudulent hospital status policies and practices for making hospital status designations even where EHR was not involved.  These hospital claims are false for numerous reasons including violations of medical necessity requirements, violations of hospital utilization review requirements, violations of physician order requirements, false certifications on claims submissions and hospital enrollment agreements, and violations of anti-kickback rules. By purposefully, falsely, and systematically billing inpatient and observation services for cases that did not meet regulatory requirements, Defendants vastly increased their profits at the expense of the Federal Government.

5.     Government programs require that treating physicians use expected duration of hospital services as the determinative factor in determining hospital status medical necessity.   Put differently, the Government requires, and has at all relevant times required, hospital status medical necessity determinations to be time-based.  Contrary to that hospital status medical necessity requirement, EHR based its "Medical Necessity Certifications" ("Certifications") on a purported assessment of risk, rather than expected duration of medically necessary hospital services, and moreover used fake science high risk/low risk checklists to determine risk. Even a high-risk patient who is expected to need a short duration of hospital

services does not meet government program requirements for inpatient medical necessity. Such a patient can receive the same scope and intensity of hospital services regardless whether classified as an inpatient or outpatient. In addition to falsely assessing risk rather than expected duration of hospital stay, the EHR methodology is premised on fake science criteria that are unconnected to, and do not reliably predict, anticipated duration of hospital services.

6.     By relying on EHR's policies and practices to determine hospital status for billing hospital and physician services, Defendants illegally delegated hospital status decision-making and oversight of hospital status determinations to a billing vendor and fraudulently assigned hospital status. The Hospital Defendants retained EHR to facilitate fraudulent inpatient and observation orders, and in an effort to mask their scheme to submit false claims for payment to the Government.

7.     The Office of the Inspector General ("OIG") has recognized that fraud, waste, and abuse related to short stay hospitalizations are significant threats to the integrity of government health programs. Short stays can be defined as inpatient hospital stays lasting one or fewer days. CMS and OIG at times have defined short stays as two or fewer days. Days are counted in number of midnights. In the 2018 Top Management and Performance

Challenges facing the Department of Health and Human Services, the OIG reported: "OIG found that hospitals billed for many potentially inappropriate short inpatient stays; for these stays, Medicare paid a total of almost $2.9 billion. OIG also found that hospitals may have financial incentives to use short inpatient stays, and that some hospitals increased their use of these stays, which is inconsistent with the stated goals" of Medicare regulations concerning these stays. U.S. Dep't of Health and Human Services, Office of the Inspector General, 2018 Top Management & Performance Challenges Facing HHS, https://oig.hhs.gov/reports-and-publications/top-challenges/2018/2018-tmc.pdf (last visited March 26, 2020).

8.    The Government routinely relies on whistleblowers and the False Claims Act ("FCA") to address the epidemic of fraudulent short-stay inpatient claims because payment of claims based on hospital status is largely an "honor system." At the time of payment, the Government has no mechanism to identify claims tainted by fraud (including Defendants' and EHR's fraud).

9.    In recent years, the Department of Justice has reached FCA settlements with numerous EHR-client hospitals and hospital systems, including examples in the chart below. The DOJ settlements listed in the table below include various government programs (*e.g.* Medicare, Medicaid, TRICARE) and various services (*e.g.* kyphoplasty, elective cardiac

procedures).  For example, the Oklahoma Heart Hospital settlement covered

only Medicaid and cardiac stents.  The Genesis Health Systems and Mercy

Health System settlements followed self-disclosures by the hospital systems.

| Defendant | Settlement Date | Amount ($M) | Defendant Size |
|---|---|---|---|
| Oklahoma Heart Hospital (OK) | 2019 | 2.8 | 99-bed hospital |
| Genesis Health System (IA) | 2018 | 1.88 | 3-hospital |
| Banner Health (AZ) | 2018 | 16 | 10-hospital |
| Prime Health Care (CA) | 2018 | 65 | 23-hospital |
| Kyphon Client Hospitals (USA) | 2017 | 90 | Various |
| Renown Health (NV) | 2016 | 9.5 | 2-hospital |
| Community Health Systems (USA) | 2014 | 98 | Various |
| Dignity Health (CA/NV/AZ) | 2014 | 37 | 12-hospital |
| Shands HealthCare (FL) | 2012 | 26 | 6-hospital |
| Christus Spohn Health System (TX) | 2012 | 5 | 6-hospital |
| El Centro Regional Medical | 2010 | 2.2 | 161-bed |
| Mercy Health Systems (PA) | 2010 | 7.9 | 5-hospital |
| St. Joseph's Hospital (GA) | 2007 | 26 | 410-bed |

10.    Dr. Polansky joined EHR after 8 years working at the Centers for

Medicare & Medicaid Services as a senior medical officer in various roles in

translational medicine and program integrity.  He worked with the senior

leadership of EHR as the Executive Medical Director and member of the

Strategic and Tactical Action Team (STAT) from 2011-2012.  The STAT

team was tasked with addressing the company's and client hospitals' most

sensitive matters, including client medical review audits by government contractors, OIG audits, and DOJ investigations.  As part of his orientation, Dr. Polansky received front line training as a "Physician Advisor."  He had wide-ranging access to thousands of draft and final documents related to EHR's policies, practices, audits, marketing presentations, etc., which he reviewed during and after his departure from EHR.  He learned how EHR created its high risk/low risk checklists and ensured standardization of how its Physician Advisors mechanically applied its fraudulent fake science medical necessity methodology.  He learned how its fraudulent hospital status policies and practices were standardized and implemented at thousands of client hospitals.    Dr. Polansky, prior to his termination, memorialized to EHR's senior leadership his concerns about EHR's scheme to defraud the government.  Subsequent to his termination, he detailed his concerns about EHR's business practices to its new corporate owner, UHG/Optum.

11.    After departing EHR, Dr. Polansky worked at two client hospitals providing Utilization Review leadership, seeing first-hand the standardized implementation of EHR products and services.  He worked at Holy Spirit Health System between 2013 and 2014 and at Summit Health in 2015. Dr. Polansky also worked for two government contractors that audited Medicaid hospital claims tainted by EHR.  This included his work as the

7

National Medicaid Medical Director for Health Management Systems in 2012-2013, and his work as a Medical Director at Delmarva Foundation in 2014-2015. At both hospitals and his work as a government contractor, he saw first-hand that EHR's standardized hospital status policies and practices remained just as fraudulent and indefensible as when he had been employed by EHR, and that EHR and its hospital clients continued to use a fake science risk-based approach to hospital status to defraud the Government.

12.   For a fee of approximately three hundred dollars per patient, EHR remotely reviews cases selected by the Hospital Defendants. EHR encourages hospitals to conduct a first-level review of hospital status using industry standard tools and send EHR a high percentage of the cases that failed that first-level review for inpatient status. Dr. Polansky is aware from his experience at EHR and two client hospitals that only a small group of hospitals had agreements to deviate from EHR's standard policies and practices. The vast majority underwent standardized implementation and workflow procedures for EHR's concurrent review and appeals services. To Dr. Polansky's knowledge, based on that prior experience, the Hospital Defendants were not among the EHR client hospitals granted "Concurrent Review Exceptions" and thus followed EHR's standard policies and practices.

8

13.     EHR provided the Hospital Defendants with "Medical Necessity Certifications."  These Certifications were not based on the current clinical status of the patient and were produced from the mechanical application of EHR's proprietary checklists that included criteria based on fake science that classified patients as "high"- or "low"-risk.  The vendor's Physician Advisors mechanically applied these checklists and certified "high"-risk patients as inpatient and "low"-risk patients as observation or outpatient (emergency room services only).  The fake science behind EHR's high risk/low risk checklists includes mischaracterizing patient characteristics such as patient age, comorbidities, and past medical history as "high-risk" factors for purposes of inpatient hospital Certifications and conflating long-term risk factors as short-term risk factors. The focus on whether a patient met inpatient status based on whether she was "high risk" is deficient not only because it fails the requirement to forecast an extended length of stay, but also because it is based on the false premise that "high risk" patients would need a "higher level of care" that could be provided only with inpatient status.  In fact, the hospital status designation does not impact the scope or intensity of services provided in a hospital.

14.     Treating physicians at the Hospital Defendants conformed their hospital status orders to match the EHR Certifications.   This included

changing initial orders that did not match EHR's Certifications and retaining initial orders that failed the relevant hospital status requirements. These Certifications not only determined the hospital status requirements for cases reviewed by EHR, but also tainted hospital status determinations and related hospital status policies and practices at the Hospital Defendants, conforming them to the fraudulent and improper EHR policies and practices. Pursuant to routine practice, treating physicians at EHR client hospitals, including specifically at the Hospital Defendants, were expected to and did accept these false hospital status Certifications and related policies and practices, all to the benefit of the hospitals.

15.    The Hospital Defendants were required by regulation to review and correct treating physician hospital status orders through a "Utilization Review" Plan and "Utilization Review" Committee. Instead, the Hospital Defendants delegated their hospital status oversight obligations to EHR and were able to convert substantial numbers of short-stay cases to higher paying services. In marketing to hospitals, including the Hospital Defendants, EHR touted its "conversion rates" to inpatient status for cases that did not meet the hospital's medical review criteria for inpatient services. This included cases that had initial treating physician orders for observation or emergency room

10

services, and a range of routine short-stay minor procedures that rarely meet Medicare requirements for inpatient or observation services.

16.     For example, a sample of EHR's own national data Dr. Polansky had access to from his work at EHR reveals that EHR in 2010 converted on average approximately 75% of cases that failed client hospitals' inpatient review criteria, including a 73% conversion rate for Geisinger Community Medical Center.  When Dr. Polansky later went to work for Geisinger Holy Spirit, he discovered that EHR's conversion rate for Geisinger Holy Spirit was 64%, for the twelve months ending on January 31, 2014 (covering 540 cases). The vast majority of these cases converted to inpatient status only met requirements for observation or emergency room services.  This conclusion is based on Dr. Polansky's experience at EHR, two government Medicaid contractors, two client hospitals, and included reviewing EHR high risk/low risk checklists, EHR Certifications, appeal records for Traditional Medicare/Medicare Advantage/Medicaid cases, and related medical records in conjunction with other expert colleagues.

17.     By implementing EHR's policies and practices, Defendants were able not only to dramatically increase the number of claims for inpatient services but also to bill for observation services when only short emergency room services were required.  Not only did the Hospital Defendants submit

11

false hospital claims, but related Defendant Spirit Physician Services Inc. submitted false professional (i.e. physician) claims. Physician claims are based on the same hospital status requirements as hospital claims.

18.     Based on Dr. Polansky's first-hand knowledge from EHR in 2011 and 2012, and at client hospitals in 2013-2015, treating physicians at EHR client hospitals like the Hospital Defendants with rare exception accepted EHR's hospital status policies and practices. Based on this same first-hand experience, EHR client hospitals like the Hospital Defendants delegate to EHR their required oversight and correction of orders that violate hospital status requirements and submit these false claims for payment to Medicare and Medicaid according to the EHR certification, with only very rare exceptions. This is illustrated by Geisinger Holy Spirit's Director of Hospitalists, who told Dr. Polansky on February 19, 2014 that "we follow EHR recommendation 100% of the time and have adopted EHR's risk-based determination of hospital status."

19.     Like all EHR client hospitals, the Hospital Defendants were on notice that EHR policies and practices violated federally mandated hospital status requirements. Nonetheless, in the interest of profits over compliance, Defendants continued to bill false claims. At Geisinger Holy Spirit, Dr. Polansky and Dr. DeLone (Dr. Polansky's predecessor) communicated to the

12

hospital's leadership on an ongoing basis their concerns about the adoption of EHR policies and practices. In 2014, Dr. Polansky shared with Holy Spirit's leadership the results of an audit conducted by Accretive, another billing vendor, which reinforced that delegating hospital status decision-making and billing to EHR was a substantial compliance risk.

20.     Dr. Polansky was not allowed to participate and interact with the Geisinger due diligence team or Utilization Review colleagues at other Geisinger hospitals to investigate and discuss his concerns prior to the acquisition of Holy Spirit by Geisinger Health.  On information and belief, ongoing government audits and appeal denials provided further knowledge to the Defendants regarding their violations of Medicare hospital status requirements.

21.     In addition, Dr. Polansky has direct knowledge that Spirit Physician Services Inc. and Geisinger Holy Spirit implemented an illegal kickback scheme to incentivize its hospitalist group to upgrade hospital status. At Geisinger Holy Spirit, like many hospitals, the majority of hospital status orders were not written by the patients' community-based physicians but by a group of physicians who only manage patients during their hospital course. These physicians are called hospitalists, and were employed by Spirit Physician Services Inc.  The hospitalist incentive plan implemented by Spirit

13

Physician Services Inc. provided for greater bonus compensation for ordering services with higher-paying hospital status.  Dr. Polansky raised this issue as a serious compliance concern to the Geisinger Holy Spirit and Spirit Physician Services executive team and was forbidden from discussing his concerns about the program with other Geisinger colleagues or learning if other Geisinger hospitals had similar programs.  Geisinger Holy Spirit and Spirit Physician Services ignored his concerns about the hospitalist program.

22.   Dr. Polansky's position was eliminated on May 19, 2019, shortly after his last email emphasizing his compliance concern about the hospitalist bonus program.  This was despite the ongoing recognition of his work by the CFO, the revenue cycle team, the compliance team, and others in his efforts to build a compliant and high performing utilization management program. His work as the Chief Physician Advisor for Geisinger Holy Spirit's commercial insurance contracts was vital to the financial health of the institution.  Dr. Polansky declined a severance package that would have required him to sign a general release and waiver of all claims and legal causes of action against Geisinger Holy Spirit and agree to not engage in any activities or make any statements that reflect negatively on the released parties.

23.   Defendants' knowing violation of government program hospital status requirements (including Medicare, TRICARE, and Pennsylvania

Medical Assistance) led to thousands of false claims being submitted to government and commercial payors and many millions of dollars being looted from the public fisc. The claims are false for numerous reasons including violations of medical necessity requirements, violations of hospital utilization review requirements, violations of physician order requirements, false certifications on claims submissions and hospital enrollment agreements, and for Spirit Physician Service's illegal kickbacks to hospitalists.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. §§ 3729, *et seq.*, specifically 31 U.S.C. §§ 3732(a), and also pursuant to 28 U.S.C. §§ 1331 & 1345.

25.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

26.     Venue in the Middle District of Pennsylvania is proper under 31 U.S.C. § 3732(a). Defendants' places of business are located in this district.

**PARTIES**

27.     Relator brings this action on behalf of the United States of America.

28.     The United States of America is a sovereign national government that, among other things, funds and operates the Medicare, TRICARE, and Medicaid health insurance programs, acting through the United States Department of Health and Human Services/Centers for Medicare & Medicaid Services ("CMS") and the United States Department of Defense.

29.     Relator Jesse M. Polansky, M.D., M.P.H., is a citizen of the United States and a resident of Baltimore, Maryland.  Dr. Polansky is a licensed physician with broad-based Medicare, Medicaid, and commercial health insurance experience in evidence-based medicine, utilization review, and informatics.  Dr. Polansky began advising senior management at EHR regarding regulatory affairs, business development, new product development, and professional services on or about December 14, 2011 until he left EHR on or about February 13, 2012.

30.     Beginning in the fall of 2012, and continuing through the summer of 2013, Dr. Polansky was employed by Health Management Systems, Inc. ("HMS"). HMS's business units include Recovery Audit Contractors for both federal Medicare and state Medicaid programs. Dr.

16

Polansky served as the HMS National Medical Director, Medicaid Recovery Audit for the duration of his contract.

31.    Beginning in or around December 2013, and continuing through May 2014, Dr. Polansky was employed by Holy Spirit Health System, a health system including Holy Spirit Hospital, a 300-bed community hospital located near Harrisburg, Pennsylvania, as its Chief Physician Advisor. One of Dr. Polansky's primary duties involved leading efforts to ensure that Holy Spirit correctly assigned hospital status for its commercial health insurance clients. As detailed more fully in Section I.A below, since at least 2010, Geisinger Holy Spirit had contracted with EHR to provide hospital status reviews and appeals for its Medicare and Medicaid cases.  EHR's fake science risk-based hospital status policies and practices were adopted by Geisinger Holy Spirit and used to submit false claims for all its payors whether it be Medicare, TRICARE, Pennsylvania Medicaid, or a commercial health insurance contract. In the course of his work at Holy Spirit, Dr. Polansky was provided access to EHR's standardized hospital portal "EHR Exchange."   EHR Exchange provides comprehensive records and reports for all Medicare and Medicaid cases EHR certified and/or appealed for Holy Spirit from 2010 up through May 2014, as well as to the full range of documents and

communications (promotional materials, analytic reports, training programs, etc.) that EHR typically provides to its client hospitals.

32.     In 2014, shortly after Dr. Polansky's position was eliminated, Holy Spirit became an affiliate of Geisinger Health.  The letter of intent to acquire Holy Spirit was signed in September of 2013.  During Dr. Polansky's employment at Holy Spirit, Geisinger did extensive on-site due diligence about the clinical and financial operations of Holy Spirit, but Dr. Polansky was not permitted to have any contact with the Geisinger team doing the due diligence.

33.     Another EHR client hospital and defendant, Geisinger Community Medical Center, had been previously acquired by Geisinger Health in 2012.

34.     In 2014, Dr. Polansky served as a medical director for the Delmarva Foundation, a contractor of Maryland Medicaid, which included conducting medical review of hospital claims submitted by EHR client hospitals in Maryland.

35.     Beginning in the spring of 2015, and continuing through August 2015, Dr. Polansky was employed by Summit Health ("Summit"), an integrated health system including two hospitals near Chambersburg,

18

Pennsylvania, as Summit's Medical Director for Care Management. Summit also contracted with EHR to handle hospital status determinations.

36.     As a result of his work at Holy Spirit, Health Management Systems, Delmarva Foundation, and Summit spanning 2012-2015, Dr. Polansky observed that the standardized implementation and acceptance of EHR hospital status policies and practices at EHR client hospitals continued substantially unchanged from the time Dr. Polansky worked at EHR.

37.     Dr. Polansky received his bachelor's degree in chemistry from Wesleyan University and his medical degree from Mount Sinai School of Medicine. He was awarded a Master of Public Health, Division of Health Policy and Management from the Columbia University School of Public Health. He began his professional career at CMS as an Expert Consultant and went on to various leadership positions in the health care industry. In 2003, he rejoined CMS and served in leadership positions at the agency in the eight years prior to joining EHR. This included serving as the Director of the Division of Items and Devices in the Coverage Advisory Group and then being asked to join the Office of Financial Management as the senior physician for the agency's Program Integrity Group. The allegations in this Complaint include knowledge and information from Dr. Polansky's experience advising public and private sector payors, providers, and medical

19

review organizations in health care program integrity, evidence-based medicine, and informatics.

38. Defendant Geisinger Holy Spirit (f/k/a Holy Spirit Hospital) is a 307-bed non-profit Catholic community hospital located in Camp Hill, Pennsylvania, a suburb of Harrisburg, Pennsylvania. The hospital's name was changed as part of a rebranding campaign to Geisinger Holy Spirit. Geisinger Holy Spirit is incorporated in Pennsylvania and owned and operated by Geisinger Health. Geisinger Health is a Pennsylvania not-for-profit corporation with offices located at 100 North Academy Avenue, Danville, Pennsylvania. Geisinger Health is a diversified multi-billion-dollar health care company which includes acute care hospitals and medical groups in Pennsylvania and New Jersey. Its hospital operations include Geisinger Community Medical Center, Geisinger Holy Spirit, Geisinger Medical Center, Geisinger Wyoming Valley Medical Center, Geisinger Lewistown Hospital, Geisinger Schuylkill County, Geisinger Shamokin Area Community Hospital, Geisinger South Wilkes-Barre, Geisinger St. Luke's Hospital, AtlantiCare Health System, and Geisinger Marworth.

39. Defendant Geisinger Community Medical Center is a not-for-profit general, acute care hospital located in Scranton, Pennsylvania. Geisinger Community Medical Center's corporate parent is Geisinger Health.

40.     Defendant Geisinger Medical Center is a not-for-profit general, acute care hospital located in Danville, Pennsylvania.  Geisinger Medical Center's corporate parent is Geisinger Health.

41.     Defendant Spirit Physician Services Inc. is a not-for-profit organization that manages primary care and specialty physician practices.  It is located in Camp Hill, Pennsylvania.  Spirit Physician Services Inc. is incorporated under Pennsylvania law and its corporate parent is Geisinger Health.

## GOVERNMENT HEALTH PROGRAMS

42.     The Medicare Program was established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395iii.  It is a federal health insurance program that pays for covered medical care provided to eligible aged and disabled persons.  Three major parts of Medicare are relevant here, Parts A, B, and C.  Medicare Parts A and B are typically referred to as Traditional Medicare and are administered by the Centers for Medicare & Medicaid Services.  Medicare Part C is typically referred to as Medicare Advantage.

43.     Medicare Part A authorizes payments for covered hospital inpatient services and other institutional care, including skilled nursing facility and home health care services.  *See* 42 U.S.C. §§ 1395c, 1395d, 1395i.  Medicare Part B establishes a voluntary supplemental insurance program that

pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services and hospital outpatient and hospital observation services. *See id.* §§ 1395k, 1395m, 1395x.

44.   As described below, the cost to the Medicare program is substantially higher when a patient is designated as an inpatient rather than an observation patient, or as an observation patient rather than one requiring a short emergency room visit.

45.   Medicare Part C, commonly known as the Medicare Advantage program, authorizes private health insurance companies to administer Medicare benefits on behalf of the United States. 42 U.S.C. §§ 1395w-21, 1395w-28.   These insurance companies—known as Medicare Advantage Organizations—offer Medicare Advantage plans to Medicare beneficiaries who pay monthly premiums and copayments to the Medicare Advantage Organizations.   Unlike Medicare Parts A and B, under the Medicare Advantage program the Federal Government pays private Medicare Advantage plans to administer Medicare.   Medicare pays these plans a monthly amount per beneficiary to provide health benefits to each beneficiary. A substantial portion of the federal payments to Medicare Advantage Plans cover claims for inpatient and outpatient hospital professional and facility

22

services.   The payments to Medicare Advantage Plans are periodically adjusted to reflect the cost structure of Traditional Medicare.   Therefore, costs based on false claims for professional and hospital services in Traditional Medicare increase Medicare payments to Medicare Advantage plans.

46.   Each Medicare Advantage Organization must also adopt and implement an effective compliance program that includes measures that prevent, detect, and correct fraud and non-compliance with CMS' program requirements.   42   C.F.R.   § 422.503(b)(4)(vi).   Medicare Advantage Organizations can enter into contracts with providers to provide health care services for enrollees on behalf of the organization, but "[a]ll contracts or written agreements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions." 42 C.F.R. § 422.504(i)(4)(v), Medicare IOM Pub. No. 100-16, Ch. 4, §90.5.   Applicable Medicare requirements include the medical necessity of hospital services, including for minor procedures.

47.   TRICARE (formerly known as CHAMPUS) administers the health care program for military personnel and their dependents and is a component agency of the U.S. Department of Defense.   10 U.S.C. §§ 1071-1110.   Healthcare suppliers who participate in the TRICARE program bill an insurance carrier designated by TRICARE to obtain reimbursement for

services.  That insurance carrier ultimately receives payment from the United States government.   The funds used to pay TRICARE claims are thus government funds.  *See* 10 U.S.C. § 1079(i)(2).

48.     TRICARE uses a DRG-based payment system modeled on the Medicare Prospective Payment System.   In all relevant respects, the TRICARE system follows the rules that apply to the Medicare Prospective Payment System, and, like Medicare, reimburses only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury," *see* Civilian Health and Medical Program of the Uniformed Services, 32 CFR § 199.14(a)(1)(i)(A). The rules that apply to Medicare beneficiaries and providers apply equally to TRICARE beneficiaries and providers, including medical necessity for hospital services.

49.     As described below, the cost to TRICARE is substantially higher when a patient is designated as an inpatient rather than an observation patient, or as an observation patient rather than one requiring emergency room services.

50.     Medicaid is a government health insurance program for the underserved that is jointly funded by the federal and state governments. *See* 42 U.S.C. §§ 1396, *et seq*.  Each State administers its own Medicaid program. However, each State program is also governed by federal statutes, regulations,

and guidelines that must be followed in order to be eligible for federal payments. The federal government matches state spending for eligible beneficiaries and qualifying services (like physician and facility payments for hospital services), adjusted based on the state's per capita income. Therefore, more fraudulent claims results in greater federal payments. The federal portion of each State's Medicaid payment—the Federal Medical Assistance Percentage—is based on that State's per capita income compared to the national average, but the absolute amount of federal funds that flow to any given State's Medicaid program will vary based on the overall level of Medicaid claims paid by the State, which means that fraudulently inflated Medicaid claims will drive up the amounts paid by the federal government to the State. Pennsylvania Medicaid is known as Pennsylvania Medical Assistance. It provides access to health insurance for significant numbers of its beneficiaries through contracts with commercial health insurers through a program called Pennsylvania HealthChoices.

## FEDERAL LAW TO PROTECT THE INTEGRITY OF GOVERNMENT HEALTH PROGRAMS

51. On May 20, 2009, Congress enacted the Fraud Enforcement Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended the FCA and re-designated § 3729(a)(1) as § 3729(a)(1)(A), § 3729(a)(2) as § 3729(a)(1)(B), and § 3729(b) as §§ 3729(b)(1)(A) & (B).

52.   The FCA, as FERA has amended it, now imposes liability on:

[A]ny person who—

(1)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(A)-(B).

53.   The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

54.   The term "claim" post-FERA means:

[A]ny request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i)   is presented to an officer, employee, or agent of the United States; or

(ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)   provides or has provided any portion of the money or property requested or demanded; or

26

> (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

55.    Under 31 U.S.C. § 3729(b)(4), the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

56.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs. In relevant part, 42 U.S.C. § 1320a-7b(b) provides:

> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

27

57.    The CMS-1500 form which is used to submit claims for physician services requires submitters to certify that each "claim . . . complies with all applicable laws . . . including but not limited to the Federal anti-kickback statute."  The CMS-1450 form which is used to submit claims for hospital services requires the submitter to certify that they understand that "misrepresentation or falsification of essential information as requested by this from may serve as the basis for civil monetary penalties and assessments . . . under federal and/or state laws."

58.    Compliance with the Anti-Kickback Statute is a condition of payment by federal programs such as Medicare, Medicaid, and TRICARE. Violation of the statute can subject the perpetrator to exclusion from participation in federal health care programs and to civil monetary penalties. 42 U.S.C. § 1320a-7a(a)(7); § 1320a-7b(b)(9).

## FACTUAL ALLEGATIONS

### I.    Defendants' Scheme to Submit False Claims for Inpatient Services and Outpatient Hospital Observation Services

#### A.    The Scheme: Use a Fake Science Risk-Based Methodology to Increase Inpatient and Observation Claims

59.    Starting in 2010, when Defendants Geisinger Community Medical Center and Geisinger Holy Spirit retained EHR as their billing vendor—and in the case of Geisinger Medical Center, by at least 2014 when

28

Dr. Polansky was made aware that Geisinger Medical Center was an EHR client—EHR remotely reviewed cases selected by the Hospital Defendants for concurrent review of hospital status. This included sending to EHR those Medicare and Medicaid cases that failed the hospitals' review for inpatient services. The Hospital Defendants implemented standardized EHR policies and practices, which they relied upon to defraud the Government.

60. Dr Polansky learned during his time at EHR in 2011-2012 that only a handful of hospitals deviated from EHR's standard policies and practices. These hospitals had "Concurrent Review Case Exceptions." Dr. Polansky also saw first-hand at Holy Spirit in 2013-2014 and Summit Health in 2015 the standardized implementation of EHR's policies and practices at EHR client hospitals. The Hospital Defendants did not receive an exception to the standard EHR concurrent review and appeals implementation policies and practices. EHR Physician Advisors required specific training for hospitals with Concurrent Review Case Exceptions prior to conducting and documenting reviews in the EHR operational database called EHRic.

61. It is routine practice at hospitals, including the Hospital Defendants, to have case managers, who are typically nurses, apply industry standard medical review criteria to assist treating physicians in determining hospital status. For example, Geisinger Holy Spirit purchased the publicly

available and most widely used McKesson's InterQual review criteria to accomplish these reviews.

62.    The Hospital Defendants sent cases that failed the hospitals' review for inpatient services to EHR, so that EHR could conduct a secondary review by one of its remotely located "Physician Advisors." The EHR Physician Advisors were not required to be members of the hospital medical staff or licensed in Pennsylvania. Generally, the information provided to EHR consisted of a clinical snapshot of patient information prepared by a case manager and conveyed to EHR without review by any hospital physician, whether it be the treating physician or a Utilization Review physician.

63.    EHR encouraged the Hospital Defendants to provide clinical snapshots as early in the patient's hospital course as feasible. This practice was designed to limit the availability of diagnostic results and the patients' short-term response to treatment. The availability of diagnostic tests and response to therapy are key pieces of information that enable forecasting of the duration of medically necessary hospital services. This information is typically necessary for the types of cases EHR typically reviews (*e.g.* chest pain, heart failure, asthma, and elective cardiology procedures) to allow treating physicians to accurately and reliably determine expected duration of hospital services. EHR and Defendants did not want this information available

when the hospital status decision was made, because that information, when it did come in, generally did not support an extended length of stay and inpatient admission.   Instead, the EHR Certifications were based on the limited clinical information generated at the time of the patient's presentation to the hospital.   Upon receipt of that limited information, EHR remotely reviewed the clinical snapshot provided by the hospitals and rendered a hospital status Certification back to the hospital.   EHR certified one of four options: (1) inpatient services were medically necessary, (2) observation services were medically necessary, (3) an outpatient surgical procedure was medically necessary, or (4) neither inpatient nor observation services were medically necessary (*i.e.* only a short emergency room visit was medically necessary).

64.    According to the EHR Certification integrated into each of the Hospital Defendants' medical records, the EHR Physician Advisor "pursuant to the Utilization Management Plan, has reviewed the medical information [on the above patient]. The recommendation is made by the Physician Advisor based upon the current available medical information, *as of the date of this recommendation [emphasis added]*. This patient is appropriately placed as [Inpatient – receiving inpatient services]."

65.     As revealed above in the EHR Certification, EHR's Certification was based only on the limited clinical information available to the EHR Physician Advisor at the time he/she certified the case. The patient's actual current clinical information was often not available or considered by EHR in issuing its Certification. Defendants' treating physicians' acceptance of an EHR Certification based on out-of-date and willfully incomplete clinical information is on its own a substantial violation of Medicare requirements.

66.     EHR also provided Defendants with a warranty memorialized in the Standard Services Agreement (*i.e.* contract) executed with the hospital. The agreement  covers administrative appeals without charge prior to the Administrative Law Judge level, but only for cases that were certified by EHR. The warranty encourages client hospitals to refer more cases, bill cases according to the EHR Certification, and renew EHR contracts.   This is accomplished because only cases reviewed by EHR are covered by the warranty and the warranty ends if the EHR contract is cancelled. Moreover, if the hospital did not bill according to the EHR Certification, the warranty does not apply.

67.     Defendants established practices to ensure that their treating physicians conformed their orders to EHR's policies and practices, including EHR's risk-based medical review framework and EHR's fake science criteria.

32

EHR and the Defendants ignored expected duration of medically necessary hospital services as the determinative factor in assigning hospital status. Patients who met "high risk" status were certified as inpatient and patients who met "low risk" status were certified as observation or outpatient, even though the risk-based framework being used was not based on the expected duration of hospital services and did not correlate to the expected duration of hospital services.

68.    For instance, if a beneficiary presented to one of the Hospital Defendants' emergency rooms complaining of chest pain without any objective evidence of an acute cardiac condition, he or she would not meet government requirements for inpatient status as there would be no reasonable or reliable expectation that the patient would need greater than 24 hours (or after October 2013, two midnights) of hospital services. Such a case would meet Medicare requirements for observation services, including serial diagnostic testing to assess if the patient was in fact having a cardiac event. Nearly all of these patients "rule out" (*i.e.* are not having a cardiac condition) and can be discharged within 8 to 24 hours. Patients for whom observation services reveal objective evidence of a cardiac event are required to have their orders updated to inpatient status by the treating physician. Defendants, upon information and belief, accepted EHR inpatient Certifications for chest pain

33

patients based on purported high-risk status, and routinely billed such patients as inpatients in violation of Medicare's time-based requirements.

69.   For minor procedure cases, to take another example, EHR routinely certified elective cardiac stent cases as "high-risk" patients requiring inpatient services.  Defendants, upon information and belief, accepted EHR inpatient Certifications for such elective cardiac stent cases, and routinely ensured that inpatient orders were written and that the cases were billed as inpatients.  The vast majority of these elective stent cases did not meet the 24-hour requirement (nor later the Two Midnight benchmark) for inpatient services.  The EHR Certifications were based on the patients being classified as "high risk," although only a small percentage of cardiac stent cases will have a complication that will extend recovery and permit ordering observation services, much less inpatient services.

70.   Not only did Defendants ignore expected duration of hospital services, but the EHR high risk/low risk framework that Defendants' treating physicians used was based on fake science.  This fake science includes mischaracterizing patient characteristics such as patient age, comorbidities, and past medical history as high-risk factors, and conflating long-term risk factors as short-term risk factors.

34

71.   Defendants were trained by EHR that risk—not expected duration of hospital services—was the basis for EHR's medical necessity Certification.  In addition, the use of risk as the determinative factor and the mechanical application of fake science criteria to establish high-risk status were readily visible to the Hospital Defendants.  Dr. Polansky specifically reviewed and discussed EHR's fake-science risk criteria as the basis for hospital status medical necessity with senior management at Geisinger Holy Spirit, including Dr. Joseph Torchia, the Holy Spirit Health System Chief Medical Officer.

72.   In general, Defendants adopted EHR's policies and practices, including its fraudulent risk-based framework and fake-science high-risk/low-risk criteria for determining hospital status.  Using this ingrained methodology, Defendants' treating physicians wrote inpatient orders for purported high-risk patients and observation orders for purported low-risk patients.  The orders were written without consideration of the patients' underlying insurance coverage, and included Traditional Medicare and Medicaid cases as well as Medicare Advantage, Pennsylvania HealthChoices, and other commercial health insurance plans.  The wholesale adoption of EHR's policies and practices, including the fraudulent risk-based methodology, therefore included cases sent to EHR as well as cases not referred to EHR.

35

73.     EHR's and Defendants' focus on whether a patient was "high risk" to determine inpatient status is deficient not only because it fails the medical necessity requirement to forecast an extended length of stay, but also because it is based on the false premise that "high risk" patients would need a "higher level of care" that could be provided only with inpatient status.   In fact, the hospital status designation does not impact the scope or intensity of services ordered by a treating physician.

74.     EHR itself advertises in presentations sent to hospitals that the difference between "inpatient" and "outpatient" is "a coding and claims issue, not a patient care issue," that "the same services get delivered as ordered whether a patient is observation or inpatient," and that the "Bottom Line" is "Same service, same bed, DIFFERENT reimbursement (for the hospital and physician)."

75.     Further compounding the fraud, patients characterized as "low risk" at the Hospital Defendants were often assigned observation status in violation of the medical necessity requirements that the treating physician only order observation services if he/she forecasts at least 8 hours of additional hospital evaluation and treatment services.   These observation orders were written by the treating physician because observation services were certified

36

as medically necessary by EHR or based on patterns of EHR observation service certifications from similar patients.

76. Defendants also implemented a standard EHR practice commonly referred to as a "Late Order Change," whereby Defendants routinely changed outpatient orders to inpatient orders after the treating physician determined the patient was stable for discharge. Medicare requires hospital status orders to be based on the clinical status of the patient at the time the order is written. Defendants then submitted these false claims for payments. The Hospital Defendants stand apart in this respect from another EHR client hospital, Trinity Health, which implemented a rare "Concurrent Review Exception" with EHR to ensure that Trinity Health would not bill inpatient services for any EHR inpatient Certification provided on the day of discharge. Trinity was exercising caution to avoid violating Medicare requirements around "Late Order Changes."

77. Defendants, as part of embracing their billing vendor's hospital status policies and practices, willfully ignored or at least recklessly disregarded that (1) time is the determinative factor in assigning hospital status, (2) the "high risk" and "low risk" criteria used by EHR were unrelated to expected duration of hospital services and based on fake science (*i.e.* violative of the standard of practice), (3) the Certifications were often

37

unrelated to the patient's current clinical status, (4) the review process was untethered from a compliant UR Plan, and (5) there was limited or no engagement and review by a functioning UR Committee.

**B.    The Motive: Pure Profit**

78.    Defendants adopted EHR's fraudulent policies and practices for hospital status determinations because they generated millions of dollars of additional revenue from emergent and elective hospitalizations, and Defendants knew it. They also knew from their own experiences submitting claims that the risk of being audited by government payors was very low. EHR reinforced this message by routinely advising client hospitals that the risk of a case being audited was highly unlikely given that the government only has resources to review a small number of claims. EHR's message went on to say that the small loss of dollars on a rare audit was greatly outweighed by all the claims that were paid without review and audit.    EHR also encouraged hospital executives be on guard against treating physicians not following EHR policies and practices.  This included warnings about treating physicians writing outpatient surgery orders for cases that routinely failed hospital status review for inpatient status.  EHR focused these marketing messages (that outpatient orders cost the hospital money) on expensive

elective cardiac procedures (*e.g.* angioplasty, stent, defibrillators, pacemakers, and cardiac ablation) and peripheral vascular procedures.

79.    The EHR "AccURate Commercial Reviews" service illustrates the business proposition that Defendants signed on to when they implemented the hospital status policies and practices of their billing vendor, EHR: return on investment, not compliance. EHR marketed to its prospective and existing clients that its AccURate commercial reviews—which targeted commercial insurance payors—would apply the same standardized hospital status policies and practices used in EHR's traditional Medicare and Medicaid reviews. The Certifications would be done by the same Physician Advisors who underwent the same standardized training and oversight, and according to EHR would lower observation rates, defend revenue streams, and target payors based on the most favorable ROI (return on investment) opportunities.

80.    Beginning around 2013, EHR provided existing and prospective hospital clients with an analysis of the impact of implementing its AccURate service. This analysis was called AccURate Payor Contract Evaluation. Because EHR uses the same policies and procedures to certify commercial, traditional Medicare, and traditional Medicaid cases, the value proposition described in AccURate reports applies to both government and commercial payors. Moreover, commercial payors include government-backed Medicare

Advantage Plans and Pennsylvania HealthChoices Plans, as well as commercial health insurer plans for employees and retirees. This EHR analysis was designed for Chief Financial Officers, the primary decision-makers at hospitals on entering and renewing contracts with EHR.

81.    The AccURate analysis is based on claims data that hospitals provide to EHR. This data set includes the dates of admission and discharge, and comprehensive claims data and fee schedules for inpatient and outpatient services. EHR then applies its national experience from working with thousands of hospitals, including experience with Traditional Medicare and Medicaid patients, to evaluate the impact of delegating hospital status decision-making to EHR. This national experience, which has limited variation between its clients, includes delivering an 84% to 88% inpatient rate for commercial insurance products (including Medicare Advantage plans) and delivering a 76% to 80% inpatient rate for commercial contracts for Medicaid (including commercial Medicaid plans), and also accounts for EHR's $300 case review fee.

82.    The AccURate analysis includes a payor-by-payor insurance contract breakdown (*e.g.* Capital Blue Cross Medicare Advantage, Capital Blue Cross Commercial, TRICARE, and Gateway Medical Assistance) of the expected number of short stay cases billed as inpatient versus observation, and

the payment differences between inpatient and outpatient services. The ultimate point of the analysis is to show the hospital the "opportunity" it has for converting cases that fail the hospital's review for inpatient services into higher-paying claims for inpatient services—all for a modest fee of $300 per case.

83. It is telling that the payor-by-payor analysis reflected in the AccURate report recommends only sending EHR cases for insurance contracts that provide greater payments for inpatient versus outpatient services. This recommendation is a clear statement that the Hospital Defendants' and EHR's focus was on profits rather than compliance. It also illustrates that return-on-investment and meeting inpatient percentage goals are the Defendants' true motive for accepting the EHR polices, practices, and medical necessity Certifications.

84. The AccURate Payor Contract Evaluation Version 1, March 2013, is illustrative. EHR presented the 2013 AccURate report to Geisinger Holy Spirit in late 2013, as part of its ongoing efforts to motivate Geisinger Holy Spirit to expand its case referrals to EHR. At this time, Geisinger Holy Spirit was already using EHR for its Traditional Medicare and Medicaid cases, so cross-selling the product for commercial use, including Medicare Advantage, was an EHR priority. The analysis was also used to motivate

Traditional Medicare and Medicaid clients who were early adopters of commercial reviews like Geisinger Community Medical Center to expand the number of Medicare Advantage, Pennsylvania HealthChoices, and commercial cases referred.

85.    The 2013 AccURate report presented to Geisinger Holy Spirit concluded that EHR could certify for inpatient status approximately 1,100 additional cases annually that fail the hospital's review criteria for inpatient status, and further stated that this would generate approximately $1.7 million in additional revenue for Geisinger Holy Spirit after deducting EHR's fees of approximately $330,000. For just the top 10 "opportunities"—the payors with the most significant case volume and the greatest favorable differences in inpatient versus outpatient hospital payments—EHR calculated that it could earn the hospital an additional $1.2 million at an anticipated cost of $155,000 in EHR medical review services. This amounts to an astounding return on investment (ROI) of 8 dollars for every 1 dollar spent on EHR's billing service.

86.    Geisinger Holy Spirit's expected conversion rates of approximately 80% as reflected in the AccURate report are so extraordinary that they would, if legitimate, render the hospital's medical review criteria, such as InterQual, as having no utility at all. But the InterQual hospital status medical review criteria, unlike EHR's fake science high risk/low risk criteria,

42

are based on legitimate analysis of current scientific information and the current clinical status of the patient. The InterQual developer, McKesson, provides the relevant scientific citations and has made clear in public presentations that its methodology effectively differentiates cases based on expected hospital length of stay. The majority of cases that fail InterQual inpatient status are not reasonably expected to meet the Medicare requirement for extended hospital services and hence do not qualify for inpatient status under the applicable regulations. However, at the Hospital Defendants, a substantial majority of cases that failed InterQual were certified by EHR as inpatient, received inpatient orders, and were ultimately billed as inpatients without an informed second-level review by a hospital UR physician or the UM committee.

87.    The principles and data included in the AccURate report about the value proposition of EHR's fake-science risk-based methodology for determining hospital status apply equally to the Defendants' Traditional Medicare and Medicaid business. The Hospital Defendants and their CFOs were well aware (from internal data and EHR reports) of their percentages of inpatient and outpatient services, the payment differences between inpatient and outpatient hospital services, the failure rates of InterQual to assign inpatient status, and the forecasted and actual EHR conversion rates. EHR

43

was retained and those contracts continued because the Defendants recklessly and knowingly chose profits over compliance.

88.    Defendants' focus on return-on-investment and meeting targets for inpatient utilization is exactly the kind of "marketing and other practices used by some independent consultants [including "reimbursement specialists" or "billing consultants"] . . . that may put the Medicare and Medicaid programs at an increased risk of abuse," according to the Department of Health and Human Services Office of the Inspector General (OIG).  The OIG warns of "promises or guarantees" that "potentially subjects both the consultant and the provider to liability under the False Claims Act," and provides as a second example of "problematic promises" "a billing consultant promising a prospective client that its advice or services will produce a specific dollar or percentage increase in the client's Medicare reimbursements."  Dep't of Health and Human Services Office of Inspector General, Special Advisory Bulletin: Practices of Business Consultants (June 2001), available at  https://oig.hhs.gov/compliance/alerts/bulletins/index.asp (last visited March 29, 2020).  OIG's concern goes without saying— marketing a particular impact on reimbursements will incentivize the consultant to achieve the result by any means, rather than simply adhering to the Medicare and Medicaid requirements regardless of the impact on revenue.

Despite this OIG warning, Defendants maintained their focus on windfall profits over compliance.

## C.   The Scope: 2010 through Today

89.   Defendants' scheme to defraud the Government continued from at least 2010 through 2015 and, on information and belief, continues to this day.

90.   EHR executes a "standard services agreement" with its client hospitals. The agreement includes an inventory of the contracted services (*e.g.* Medicare Concurrent Review, Medicare Concurrent Procedure Review, Medicaid Concurrent Review, Commercial Proactive Admission Review, Government Medical Necessity Denials, Retrospective Appeals Review, Analytics, etc.), pricing, the appeal guarantee, and duration of the contract (the default is two years), among other things. The agreement also specifies the minimum number of cases that will be charged monthly. This monthly minimum is established based on the greater of the contracted number or 75% of the monthly volume in the first three months of the contract.

91.   Geisinger Holy Spirit signed the standard two-year contract with EHR on January 4, 2010 and executed a three-year contract renewal on January 31, 2012. The minimum monthly number of case referrals was contracted at 40. The contract included Traditional Medicare Concurrent

Review, Traditional Medicaid Concurrent Review, and Government Medical Necessity Denials.   Geisinger Holy Spirit also contracted for specialty products including the Government Interventional Cardiology, Government Vascular Minor Procedure, and Kyphoplasty reviews, as well as Analytics. The Analytics contract requires the hospital to provide comprehensive billing data to EHR. EHR merges this data with the EHR data collected during review of individual cases. This enables a range of custom and individualized reports to be produced for clients.   In particular, the hospital claims data allows reporting of actual length of stay for cases billed as inpatient and outpatient, as claims data includes admission date and discharge date.   Case referral volume for the first partial year of the contract was Traditional Medicare (707), Traditional Medicaid (8), Invasive Cardiology (74), Vascular (1), Commercial Proactive Admission Review (3), and Retrospective Commercial Medical Necessity Denial (19 for 6 months).

92.    Geisinger Community Medical Center signed a two-year EHR contract on March 9, 2010 and renewed its contract on March 8, 2012.   The contract included Traditional Medicare Concurrent Review, Traditional Medicaid Concurrent Review, Government Medical Necessity Denials, and Commercial Retrospective Medical Necessity Denials.   Geisinger Community Medical Center also contracted for Interventional Cardiology

Procedure and Vascular Procedure reviews, and Commercial Proactive Admissions Review. Case referral volume for the first partial year of the contract was Traditional Medicare (276), Traditional Medicaid (57), Invasive Cardiology (19), Commercial Proactive Admission Review (55), and Commercial Retrospective Medical Necessity Review (23 for 6 months).

93.   From what Dr. Polansky learned at EHR and Geisinger Holy Spirit, Geisinger Medical Center, the flagship hospital of Geisinger Heath, contracted with EHR sometime between 2011 and 2014. Dr. Polansky was not allowed to interact with the Geisinger Health due diligence team who were on site at Holy Spirit for months and was forbidden to reach out to Utilization Review colleagues at Geisinger Health. Therefore, he does not have access to detailed information of the scope and volume of EHR services provided to Geisinger Medical Center. Geisinger Medical Center's contract with EHR would have included case referral minimums consistent with EHR's standard practice.

94.   EHR also includes standard contractual language to permit at EHR's discretion the right to conduct quarterly audits to evaluate the volume of cases referred. These audits are designed to encourage hospitals to send more cases by providing findings that purportedly show that the hospital is missing an economic opportunity by failing to refer cases. The audits quantify

the percentage of cases that could have been converted to inpatient status and the substantial loss of revenue for failing to send the cases to EHR.  EHR audits can be triggered by the hospital falling below the 50% level of what EHR calculated to be the expected inpatient and outpatient case referrals.

95.   Defendants were able to conceal their fraud for so long in part because claims payment is in general an "honor system." Medicare pays the vast majority of hospital claims without medical record reviews or automated edits . Defendants were not required to notify the government or other payors that they contracted with EHR or for what services.  For individual false claims submitted for payment, the claim submitted did not include the medical record, the EHR Certification, or notification that the case was infected by EHR hospital status policies and practices.

## II.   Defendants' Scheme Violated Regulatory Requirements Material to Government Payment Decisions

### A.   Defendants Violated the Requirement That Hospital Service Be Medically Necessary and Most Economical

96.   Medical necessity is a fundamental requirement for Medicare (used herein as shorthand for Medicare, Medicare Advantage, and TRICARE). Medicare does not pay for hospital and physician services that "are not reasonable and necessary [*i.e.* medically necessary] for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1)(A).

97.    To be paid by Medicare, services must not only be reasonable and necessary, they must also be provided, billed, and paid in the most economical manner.  This economical manner requirement is set forth in multiple federal statutes and CMS regulations prescribing the responsibilities and obligations of health care practitioners, providers of health care services (including hospitals), and contractors who review claims for payment. *See* 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 1004.10.

98.    Likewise, Medicare review and payment contractors who review claims submitted by hospitals for fraud, waste, and abuse, are required to review whether services were medically necessary and provided, billed, and paid in the most economical manner.  This system of review was designed to ensure the integrity of Medicare Parts A, B, and C.  It requires review and denial of payment for provider and health care practitioner services that are, for example, medically unnecessary or unreasonable, uneconomical, or based on incorrect or inadequate diagnostic information.

99.    Medicare medical necessity requirements to determine the boundaries of hospital outpatient emergency room, outpatient observation, and inpatient services are and always have been time-based.  The time-based system based on the expectation of duration of the hospital stay was created shortly after the inception of the Medicare program in 1965, as memorialized

in Medicare Manuals with the force of regulation.  *See* Social Security Bureau

of Health Insurance, Health Insurance for the Aged Hospital Manual (1968),

Ch. 210.

100.   The time-based system for determining medical necessity has

been repeatedly reinforced (and periodically updated) by Medicare through

rulemaking and other forms of regulatory guidance.   Although medical

necessity for hospital status has been updated periodically, these requirements

have never deviated from using duration of medically necessary services as

the determinative factor.

101.   During the relevant time period, Medicare required an

expectation of at least 24 hours of medically necessary hospital services to

meet inpatient hospital status medical necessity requirements.   Inpatient

requirements were updated through rulemaking in October 2013, to require

either an expectation of medically necessary hospital services extending past

two midnights, or actual medically necessary hospital services extending past

two midnights.

102.   To meet medical necessity requirements for observation services,

Medicare required an expectation of at least 8 hours of medically necessary

hospital services, uncertainty as to the patient's ultimate duration of medically

necessary hospital services, and no more than 48 hours of observation services.

103.   In addition, in 1981, Medicare issued specific medical necessity instructions for minor procedures. Minor procedures include high volume elective hospital procedures, like interventional cardiology procedures, peripheral vascular procedures, etc.  That instruction required that "when a patient with a known diagnosis enters a hospital for a specific minor surgical procedure or other treatment that is expected to keep him in the hospital for only a few hours (less than 24), and this expectation is realized, he will be considered an outpatient regardless of: the hour of admission; whether or not he used the bed; and whether or not he remained in the hospital past midnight." 1981 Medicare Hospital Manual, Ch. 210.  Observation can only be ordered post-procedure if there is a heralding event, *i.e.* a significant complication that is expected to increase the duration of the hospital stay beyond a typical recovery.

104.   Medicare also instructs hospitals and physicians that hospital status is fluid, to accommodate the evolution of a patient's clinical status and to allow hospitals to inspect and correct faulty orders.  This evaluation of the expected duration of anticipated hospital services can be undertaken at any time during the patient's hospital course and can be undertaken multiple times. Time accrued in the hospital for the convenience of patients, the hospital, or physicians does not count towards forecasting expected or calculating actual

duration of medically necessary hospital services.  Moreover, according to Medicare requirements the order for inpatient status must reflect the patient's clinical status at the time of the order.

105.  Defendants violated these Government requirements by billing for inpatient and outpatient observation physician and hospital services that did not meet government medical necessity requirements.  This includes ignoring the time-based regulatory regime imposed by Medicare and adopting the fake science medical necessity framework and Certifications from EHR.

**B.**   **The Hospital Defendants Violated the Requirement that Hospitals Have a Comprehensive Utilization Review Function**

106.  Medicare requires hospitals to have a Utilization Review Plan to ensure that the hospital and physician services furnished to beneficiaries meet government medical necessity requirements and to promote the efficient use of resources.  42 C.F.R. § 482.30.  That Utilization Review (UR) function must be carried out by a Utilization Review Committee consisting of two or more practitioners, at least two of whom must be doctors of medicine or osteopathy.  42 C.F.R. § 482.30(b). The UR Committee physicians must be members of the medical staff of the hospital.  The committee can overrule the hospital status determination of the practitioner responsible for the care of the patient.  42 C.F.R. § 482.30(c)–(d).  The decision to overrule a treating

physician's hospital status determination can be made by one physician member of the UR Committee if the treating physician concurs, and must be made by at least two physician members of the UR committee if the treating physician does not concur.  42 C.F.R. § 482.30(d).

107.   The Hospital Defendants, like all EHR client hospitals that adopted EHR's policies and practices, violated these rules by delegating their Utilization Review obligations to EHR.  In fact, when Dr. Polansky joined Geisinger Holy Spirit there was no operating UR Committee and he was told there had been no committee for some time.   He was told by his management that the UR Committee was not necessary given the EHR contract.   Dr. Polansky encouraged his management to convene a UR Committee and establish a UR Plan.  The lack of a compliant UR Plan or functioning UR Committee, and allowing a billing vendor to dictate hospital status policy and decision-making, are regulatory violations material to all the Defendants' Medicare claims for hospital and physician services.

### C.   Defendants Violated the Requirement that the Treating Physician Determine and Order the Medical Necessity of Hospital Services

108.   Medicare has a longstanding requirement that the treating physician has a major role in determining utilization of services delivered by providers.  These providers include hospitals.  Accordingly, "the physician

decides upon admissions, orders tests, drugs, and treatments, and determines the length of stay." 42 C.F.R. § 424.10.

109. Medicare requires an "order" of admission reflecting a decision by "the ordering practitioner or by another practitioner who is responsible for the care of the patient only if the practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations." 42 C.F.R. § 482.24. (Between January 2008 and July 2012, that regulation provided similarly that all orders to admit as an inpatient must have been "authenticated . . . by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures," and that ordering practitioners must have been "authorized to write orders by hospital policy in accordance with State law." 42 C.F.R. § 482.24 (2008).

110. This longstanding requirement that the treating physician—not a Physician Advisor at a billing vendor—determine medically necessary hospital services was reiterated in the Two Midnight Regulation:

> The order must be furnished by a qualified and licensed practitioner who has admitting privileges at the hospital as permitted by State law, and who is knowledgeable about the patient's hospital course, medical plan of care, and current condition. The practitioner may not delegate the decision (order) to another individual who is not authorized by the State to admit

patients or has not been granted admitting privileges applicable
to that patient by the hospital's medical staff.

42 C.F.R. § 412.3(b).

111.   Defendants, like all EHR client hospitals without Concurrent
Review Exceptions, violated this requirement by delegating the hospital status
decision to EHR, *i.e.*, conforming initial orders by treating physicians to the
EHR Certifications.    Defendants not only allowed faulty initial inpatient
orders to remain as inpatient, but in cases where the treating physician's initial
order was observation or emergency room services Defendants routinely had
their case managers or EHR Physician Advisors direct treating physicians to
change their hospital status orders to inpatient—or to change their emergency
room services orders to observation—to conform to EHR's Certification.
These claims are false because they violate the Medicare requirement that the
treating physician determine hospital status.

   **D.    Defendants Violated the Requirement that the Hospital
          Status Order Must Meet Medical Necessity at the Time the
          Order is Written.**

112.   Medicare has longstanding requirements that the medical
necessity of hospital services be based on the treating physician's knowledge
of the patient's hospital course and current condition.   "The order must be
furnished by a qualified and licensed practitioner who has admitting privileges
at the hospital as permitted by State law, ***and who is knowledgeable about the***

*patient's hospital course, medical plan of care, and current condition*." 42

C.F.R. § 412.3 (emphasis added); *see also* 42 U.S.C. § 1320c–5(a).

113.   Defendants, like all EHR client hospitals without a Concurrent
Review Exception, violated this requirement because their orders were
conformed to EHR Certifications that themselves were based on incomplete
or missing knowledge of the patient's hospital course, medical plan of care,
and current condition.   As part of this practice, hospital status orders were
routinely changed on the day of hospital discharge by relying on EHR's
Certifications that were based solely on the patient's condition at a much
earlier time, such as when the patient had earlier been evaluated in the
emergency room or immediately after an elective procedure. Defendants also
engaged in this improper practice for cases that did not involve an EHR
Certification.

### E.   Defendants Violated Requirements of Pennsylvania Medical Assistance That Parallel Medicare Requirements

#### 1.   Defendants Violated Pennsylvania's Medical Necessity Requirements

114.   As with Medicare, medical necessity is also a fundamental
requirement for Pennsylvania Medical Assistance payments.   "The MA
Program provides payments for specific medically necessary medical services
and items covered by the Program and furnished to eligible recipients by

approved providers enrolled in the Program.  Payment for these services and items is subject to the provisions and limitations of this chapter, Chapter 1101 (relating to general provisions), and the specific chapters for each provider type." 55 Pa. Code § 1150.1.  Medically necessary services in Pennsylvania Medical Assistance—also as with Medicare—must be provided or ordered by an appropriate licensed practitioner in accordance with accepted standards of practice.  55 Pa. Code § 1101.21.

115.   Medical necessity is required for inpatient services, 55 Pa. Code §1163.1, and "clinically-appropriate and medically necessary observation services while a decision is made as to whether a [Pennsylvania Medicaid] beneficiary requires admission for inpatient acute care services or may be discharged to a nonhospital setting." *Id.* § 1150.56b.  Inpatient services are medically necessary if certified by the hospital's Utilization Review Committee or the Department's Bureau of Utilization Review. *Id.* § 1141.54; *see also id.* § 1163.59.  Like Medicare, Pennsylvania Medicaid has separate codes and payments for inpatient versus outpatient hospital physician services. *Id.* § 1150.56a.

116.   CMS regulations govern medical necessity for inpatient and outpatient services for Medicaid programs including Pennsylvania Medical Assistance:

"Inpatient" means a patient who has been admitted to a medical institution as an inpatient on recommendation of a physical or dentist and who—

(1) Receives room, board and professional services in the institution for a 24-hour period or longer, or

(2) Is expected by the institution to receive room, board and professional services in the institution for a 24-hour period or longer even though it later develops that the patient dies, is discharged or is transferred to another facility and does not actually stay in the institution for 24 hours.

\* \* \* \* \*

"Outpatient" means a patient of an organized medical facility or distinct part of that facility who is expected by the facility to receive, and who does receive, professional services for less than a 24-hour period regardless of the hour of admission, whether or not a bed is used or whether or not the patient remains in the facility past midnight.

42 C.F.R. § 440.2.

117.  In fact, when proposing what ultimately became 42 C.F.R. § 440.2, CMS stated their clear "intent" to make the Medicaid definition of inpatient and outpatient "more consistent with the Medicare definitions of these terms" (citing Medicare Part A Intermediary Manual § 101).  CMS also addressed the interlocking relationship between inpatient and outpatient services:

"Additionally, we believe that the definitions should be located in both Parts 435 and 440 to facilitate use of the regulations, to eliminate any possibility of either definition being overlooked and to make the relationship between 'inpatient' and 'outpatient' clear. We, therefore, propose to

add the definition of "outpatient" to § 435.1009 (which currently defines 'inpatient') and to add the definition of 'inpatient' to § 440.2 (which currently defines "outpatient" and "patient")."

Medicaid Program; Relation With Other Agencies and Miscellaneous Medicaid Definitions, 48 Fed. Reg. 10378 (proposed Mar. 3, 1983) (to be codified at 42 C.F.R. pt. 431, 435, 440, 441, and 447) (emphasis added).

118. By adopting EHR's fake science risk-based methodology and thus violating these time-based federal and state mandated Medicaid medical necessity requirements, Defendants submitted false claims for inpatient and outpatient services to Pennsylvania Medical Assistance and Pennsylvania HealthChoices Plans (Managed Medicaid).

### 2.     The Hospital Defendants Violated Pennsylvania's Hospital Utilization Review Requirements

119. Pennsylvania Medical Assistance, like Medicare, requires a Hospital Utilization Review program and Utilization Review Committee that conducts reviews of each Medical Assistance recipient's need for admission for inpatient hospital services and short procedure unit services in accordance with the Department's Manual for Diagnosis Related Group Review of Inpatient Hospital Services. 55 Pa. Code §1163.41; *see also id.* § 1163.72. Hospitals are also required to submit a Place of Service Review (PSR) prior

to any non-urgent or non-emergent hospital admission.   55 Pa. Code § 1150.59.

120.   A member of the UR Committee cannot have a direct or indirect financial interest in the hospital.   *Id.* § 1163.74.   To ensure that hospital admissions are necessary, each hospital's utilization review committee must establish written criteria on which the hospital bases a recipient's need for admission.   *Id.* § 1163.73; *see also id.* § 1163.77 (noting that "[t]he criteria shall be more extensive for those admissions known to be associated with high costs, associated with the frequent furnishing of excessive services, or authorized by a physician whose patterns of care are questionable" and "[t]he hospital utilization review committee or its representative shall assess the need for hospital inpatient services by comparing each admission to the hospital's written criteria.").   The Defendants violated the Medicaid requirement that their UR Committee establish written criteria to base hospital status decision-making on.   In place of establishing written criteria, the Defendants adopted EHR's fake science risk-based criteria.

## III.   Defendants Falsely Certified Compliance with Law Governing Their Claims for Payment

121.   Hospitals that participate in the Medicare program, along with other federal health care programs, must enter into contracts (or "Medicare Enrollment Applications") with CMS in a contract form known as a "CMS

855-A" form.  The Hospital Defendants executed Enrollment Applications
with CMS where each hospital represented that it "understand[s] that payment
of a claim by Medicare is conditioned upon the claim and the underlying
transaction complying with such [Medicare] laws, regulations, and program
instructions . . . and on the provider's compliance with all applicable
conditions of participation in Medicare."  In contracting with Medicare, the
Hospital Defendants thus falsely certified that they were submitting claims in
compliance with Medicare "laws, regulations, and <u>program instructions</u>" and
"<u>applicable conditions of participation</u>" (emphasis added).  Hospitals and
physicians sign analogous contracts with Medicare Advantage plans.

122.  In seeking reimbursement from Medicare and Medicare
Advantage Plans for false claims described in this Complaint, the Hospital
Defendants submitted CMS Form 1450 or an analogous form.  This form (also
known as UB-04) or its electronic equivalent are used to submit claims for
hospital services.  CMS Form 1450 includes a certification of the truth and
accuracy of hospital claims for payment and notes that the party submitting
the form is subject to consequences for submitting false claims:

> THE SUBMITTER OF THIS FORM UNDERSTANDS THAT
> MISREPRESENTATION    OR    FALSIFICATION    OF
> ESSENTIAL INFORMATION AS REQUESTED BY THIS
> FORM, MAY SERVE AS THE BASIS FOR CIVIL
> MONETARY PENALTIES AND ASSESSMENTS AND MAY
> UPON   CONVICTION   INCLUDE   FINES   AND/OR

IMPRISONMENT UNDER FEDERAL AND/OR STATE
LAW(S).
. . .

Submission of this claim constitutes certification that the billing
information as shown on the face hereof is true, accurate and
complete.  That the submitter did not knowingly or recklessly
disregard or misrepresent or conceal material facts.

123.   The Hospital Defendants falsely certified—in their CMS Form
1450 submissions—entitlement to payment for inpatient or observation
services despite the Hospital Defendants' knowledge that claims violated
Medicare requirements and were false claims.   The hospitals' false
certifications included among other things: (1) "the billing information as
shown on the face hereof is true, accurate and complete"; and (2) "the
submitter did not knowingly or recklessly disregard or misrepresent or
conceal any material facts."

124.   False claims for physician services provided by the hospitalists
working at the Hospital Defendants were also submitted for payment.  These
claims were submitted using CMS Form 1500 and billing codes from the
universally used CPT coding system.   On the CMS Form 1500, CPT
professional services evaluation and management codes indicate the
procedures, services, or supplies provided.   These codes differentiate
physician services provided in an inpatient hospital status from an outpatient
hospital status.  Reimbursement is in general higher for the same services

62

provided for a patient in inpatient status.  These claims for hospitalist services

at the Defendant Hospitals were certified as follows:

> Signature of Physician or Supplier (Medicare, CHAMPUS, FECA and Black Lung)
>
> I certify that . . . the services shown on this form were medically necessary and were furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE . . . .

125.   The falsely certified hospital and professional claims submitted

by Defendants on CMS Forms 1450 and 1500 did not include the EHR

Medical Necessity Certifications that the hospitals integrated into their

medical records.   Medical records (whether complete or partial) are not

typically provided with claims submissions for hospital and physician services.

126.   Certification and submission of physician and hospital claims in

Pennsylvania Medical Assistance, as a matter of standard industry practice,

also uses CMS Forms 1450 and 1500.  Hospitals and physicians, just as with

Medicare, must sign agreements with Pennsylvania Medical Assistance and

Pennsylvania Managed Care Organizations to participate in these programs.

Defendants falsely certified and submitted claims for inpatient and

observation services despite Defendants' knowledge that claims violated

Pennsylvania Medical Assistance hospital status requirements and were false

claims.

127.   Providers as part of signing an agreement to participate in the Pennsylvania Medical Assistance Program agree to be knowledgeable and comply with all federal and Pennsylvania laws governing the program, including but not limited to 42 U.S.C. § 1396 et seq., 62 P.S. §§441-451, 42 C.F.R. §§431-81, and the regulations adopted by the Department of Health and Human Services.  In contracting with Pennsylvania Medical Assistance and Pennsylvania HealthChoices Plans, Defendants falsely certified to submit claims in compliance with applicable rules, regulations, rates and fee schedules promulgated under relevant laws and any amendments thereto.

## IV.   Defendants' Violations Put Patients At Risk and Also Cost Patients More Money Out of Pocket

128.   By submitting false inpatient claims for payment as a result of adopting EHR's policies and practices for determining hospital status, Defendants put profits over patient safety.

129.   Although hospital status determinations do not affect the *scope* or *intensity* of the services provided to the patient, Defendants' fraudulent hospital status determinations often extend length of stay, which unnecessarily increases patient risk.

130.   For example, when a patient is incorrectly admitted inpatient rather than observation, or observation rather than emergency room services, the expectation for the treating physician becomes that the patient will be

staying in the hospital for an extended time. Any efforts to evaluate, treat, and then discharge the patient no longer have the appropriate urgency that would otherwise result from appropriate hospital status orders, whether these orders would require discharge from the emergency room or short-term evaluation and treatment using observation services.

131.  Extended stays in the hospital are dangerous for elderly patients, as there is an increased risk of infection, immobilization, disorientation, medical errors, and other adverse events that occur during hospitalization. The hospitals' manufactured extension of patients' hospital stays through faulty inpatient and observation orders thus needlessly exposes these patients to serious risks.

132.  In addition, the OIG has found that Medicare beneficiaries typically (though not always) pay more out of their own pocket (through their cost-sharing obligations) for short inpatient stays than for observation stays, by an average of about $325. Similarly, in a 2015 study, the AARP Public Policy Institute found that only 10 percent of Medicare outpatient observation patients spent more out of pocket for hospital services than they would have spent out of pocket as inpatients for the same services (90 percent paid less). The average Medicare outpatient observation patient spent out of pocket less than half of what he or she would have spent as an inpatient admitted post

observation ($504 versus $1068). In short, then, misclassification of Medicare beneficiaries as inpatients usually results in those beneficiaries having to pay more out of their own pocket for the same services as they would have paid had they been properly classified as outpatients. For many underserved seniors, greater out of pocket payments means financial hardship and potential delay of urgent medical services.

## V.    Defendants Knew They Were Breaking the Law

133.    At the time that Defendants submitted their false claims for payments, Defendants had actual knowledge or recklessly disregarded that these thousands of claims submitted, and the records and statements material to them, were false. They acted in reckless disregard for or deliberate ignorance of the truth of the matter when they adopted EHR's policies and practices for determining hospital status. They systematically integrated into their enterprises EHR's violative medical necessity certifications based on a fake science "risk" independent of expected duration of medically necessary hospital services. They also knew or recklessly disregarded that EHR policies and practices did not comply with applicable government requirements for hospital status, including the delegation of the Hospital Defendants' Utilization Review plan and Utilization Review committee obligations to EHR and routinely ordering inpatient services based on outdated or

incomplete clinical information. This knowledge was readily available and on information and belief reviewed by the Hospital Defendants' executive team, including key personnel like the chief financial officers, chief medical officers, chief compliance officers, and Utilization Review/Case Management executives.

134.    Dr. Polansky as part of his EHR orientation that included weeks of Physician Advisor training was instructed that only a handful of hospitals were permitted to deviate from standard EHR policies and practices for hospital status. The hospitals with "Concurrent Review Exceptions" had dedicated Physician Advisors who required specialized training prior to conducting reviews and certifying hospital status. EHR actively monitored client hospitals and treating physicians to ensure that clients without such exceptions did not deviate from EHR policies and practices. The Hospital Defendants were not granted an exception.

135.    Information was widely available to the Defendants about the scope and magnitude of false claims being submitted. This information included custom internal reports on short stay inpatient claims, payor prospective and retrospective audits of short stay hospital claims, EHR training and implementation materials, comprehensive reports on EHR Exchange (see below) including those detailing conversion rates to inpatient

services, case-specific EHR medical necessity Certifications, and case-specific appeals documents. Geisinger Holy Spirit executives even requested and reviewed an audit of representative emergent and elective admissions that was conducted by another third-party billing vendor. The findings in general did not agree with the EHR Certifications.

136.    The Defendants' leadership, including their CFOs, CMOs, Chief Compliance Officers, and Utilization Management Executives, also had to have known from trade press and presentations at conferences about ongoing U.S. Department of Justice investigations and settlements for false inpatient claims. Defendants also could not have been unaware of the high error rates identified by OIG Hospital Compliance Program audits and recoveries of short stay inpatient claims at numerous hospitals across the country. EHR client hospitals were frequently audited under this program and OIG identified high error rates for short stay claims and recovered millions of dollars of payments. Defendants' executives also had to have been aware that high error rates for short stay hospitalizations was a substantial issue for CMS, the federal agency that administers Medicare and Medicaid. CMS reported that from 2010 to 2018 over 5.5 billion dollars of Medicare payments were identified that failed medical necessity for inpatient status for just two cardiac procedures (stent and cardiac ablation) and two emergent conditions (chest

pain and syncope). These are elective procedures and emergent cases that are routinely referred to EHR by client hospitals for review and certification.

137.   In 2014, Medicare required its Medicare Administrative Contractors ("MACs") to audit hospital compliance with Final Rule CMS-1599-F (the "Two-Midnight Rule").   The Hospital Defendants without exception would have been audited as part of this directive.  Geisinger Holy Spirit like all hospitals received the results of this audit and warnings about the consequences of not following Medicare requirements.   Novitas, the Pennsylvania MAC, sent Geisinger Holy Spirit Corporate Compliance its medical review of results on April 2, 2014.  The contractor denied 9 out of the 10 claims reviewed.   Geisinger Holy Spirit compliance professionals reviewed the claims denials and determined that 8 of 9 cases denied were EHR reviewed cases.   The results were characterized by Geisinger Holy Spirit executives as a "major concern."  The letter included educational commentary and Medicare requirement references.  Geisinger Holy Spirit was notified that they would be provided with 1:1 explanation and education.  On information and belief, all the Hospital Defendants received similar letters and results given their status as a standard EHR hospital client.

138. Defendants also had constructive knowledge that inpatient and observation services they billed were not medically necessary.  Title 42,

69

section 411.406(a) of the Code of Federal Regulations states the "basic rule" that "[a] provider, practitioner, or supplier that furnished services . . . that are not reasonable and necessary under § 411.15(k) is considered to have known that the services were not covered" if one of a number of conditions are met. One of those conditions triggering a provider's actual or constructive knowledge is if "[i]t is clear that the provider . . . could have been expected to have known that the services were excluded from coverage on the basis of the following: [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives."  42 C.F.R. § 411.406(e)(1). Requirements for hospital status were not only codified in regulation but communicated broadly to Defendants in manual issuances, bulletins, and other written guides and directives.  Defendants also continued to submit false claims despite certifying at program enrollment and claims submission that they were knowledgeable and compliant with relevant statutes, regulations, and program instructions.

139.  At Holy Spirit, Dr. Polansky made multiple requests to convey his concerns about EHR policies and practices to Geisinger executives to ensure they were briefed as part of the vigorous due diligence underway in anticipation of the Geisinger Health acquisition of Holy Spirit.  Dr. Polansky was told by his supervisor, Dr. Joseph Torchia, that that was not necessary

because Geisinger Health System was well aware of EHR's business practices as a longstanding client. In fact, he was told that Geisinger Medical Center, the flagship hospital of Geisinger Health System, was an enthusiastic client, and Dr. Polansky and Dr. Torchia discussed the longstanding relationships between Geisinger and key executives at EHR. The chief architect of EHR's fake science high-risk/low-risk checklists, for example, was Tom McCarter, the EHR Chief Clinical Officer, and Dr. Polansky's former EHR supervisor. Dr. McCarter and his wife, an EHR Physician Advisor, trained at Geisinger Medical Center.

140. Dr. Polansky was not the only member of Geisinger Holy Spirit's executive staff to communicate and recognize that relying on EHR's medical necessity Certifications, policies, and practices failed to comply with applicable law. Dr. Polansky, as part of his responsibilities, discussed and documented ongoing concerns about systemic violations of Medicare requirements with the hospital's Chief Medical Officer, Chief Compliance Officer, Director of Utilization Management, and ultimately with the Chief Financial Officer. He also documented and communicated the concerns of other EHR client hospitals regarding EHR compliance with Medicare requirements.

141.   Dr. Polansky also spoke with his predecessor at Geisinger Holy Spirit, Dr. Carrie DeLone.  Dr. DeLone left Geisinger Holy Spirit to accept Gov. Tom Corbett's invitation to be the next Physician General in the Pennsylvania Department of Health.   When the administration departed, she rejoined Geisinger Holy Spirit as a Medical Director.  She described to Dr. Polansky her previous outreach to senior management to address concerns that EHR was violating Medicare hospital status requirements and putting the hospital at substantial risk.  She noted to Dr. Polansky that her concerns were also not addressed by Geisinger Holy Spirit's executives.

142.   Holy Spirit's adoption of EHR's policies and practices was a significant worry to the hospital and its executive team.  Dr. Polansky recalls the Chief Medical Officer at one-point joking, when he saw several black SUVs approaching the hospital, "the jig is up, the FBI will be on campus shortly."   There were also references made by senior management to a previous false claims case against Holy Spirit involving a prior Holy Spirit billing vendor.

143.   During a discussion on or around February 19, 2014 about an EHR certification for a Medicare patient with chest pain, the Chief Medical Officer commented that EHR inpatient certifications were "useless" and that EHR created "more compliance risk " than another vendor program that Holy

Spirit was using to optimize coding of patient severity to increase hospital payments (a similar practice by Medicare Advantage plans is currently under investigation by the Department of Justice). Similarly, the Chief Compliance Officer stated that she did not "see anything acute" (*i.e.*, warranting inpatient status) in the case under discussion, and that she understood why her colleagues (*i.e.*, compliance officers at other hospitals) were "all cancelling EHR contracts," specifically mentioning Dr. Polansky's future employer Summit Health.

144.   And yet, Geisinger Holy Spirit, in lockstep with other EHR client hospitals, kept directing its treating physicians to accept EHR's polices, practices and medical necessity Certifications, knowing they were false, in order to boost revenue and minimize turbulence in its negotiations with Geisinger Health, its suitor and another EHR client. This was confirmed by Geisinger Holy Spirit's Director of Hospitalists, who told Dr. Polansky on February 19, 2014 that "we follow EHR 100% of the time and have adopted EHR's risk-based determination of hospital status." She also told Dr. Polansky that her hospitalist team did not have concerns about deferring to EHR's policies and practices because they did not impact the scope or intensity of clinical care of the patient.

145.  Dr. Polansky subsequently met with Geisinger Holy Spirit's Chief Financial Officer on or around February 19, 2014, to discuss his detailed analysis regarding the compliance and financial risk posed to Geisinger Holy Spirit by continuing to bill hospital claims based on EHR's certifications.  The meeting also addressed ongoing concerns from the executive team and Dr. Polansky about the costs and likelihood of success of EHR's appeals services.  This included paying EHR to appeal cases going forward as well as completing the appeals for approximately 500 Medicare and Medicaid claims previously denied by the Government.  The analysis Dr. Polansky presented to the CFO included results of the external audit of cases selected and reviewed by Dr. Torchia and Dr. Polansky.  This external audit and the Holy Spirit EHR analysis showed that EHR's inpatient certifications failed to meet Medicare requirements before and after the Two-Midnight Rule for a range of specific Geisinger Holy Spirit emergent and elective admissions.  And yet Geisinger Holy Spirit continued to adopt EHR's hospital status polices, practices, and Certifications, and made no efforts to terminate the EHR contract or self-report the numerous false claims previously submitted, even after Dr. Polansky emphasized the compliance risk for the hospital in failing to act.

146.   In addition, Dr. Polansky communicated with former clients of EHR who told him of their compliance concerns surrounding EHR.   Dr. Polansky relayed all of this to Dr. Torchia and other Geisinger Holy Spirit executives.

147.   During Dr. Polansky's tenure he was repeatedly told by the treating physicians that they wrote their hospital status orders, regardless of whether the patient had public or private health insurance, based on the EHR risk-based framework they learned from working with EHR.  This included cases with EHR Certifications as well as cases that were not reviewed by EHR. This reinforced Dr. Polansky's knowledge from EHR that with rare exception treating physicians at client hospitals conformed their orders to EHR policies, practices, and Certifications.

148.   Dr. Polansky was tasked with reviewing EHR's performance under its contract with Holy Spirit to provide concurrent review and appeal services for traditional Medicare and Pennsylvania Medical Assistance.  In the course of that work, Dr. Polansky conducted and shared with Geisinger Holy Spirit's executives a comprehensive review of EHR's concurrent review and appeals services.   This included reviewing short-stay emergent and elective cases which EHR had certified as meeting Medicare requirements for inpatient and observation services.  The cases reviewed by Dr. Polansky

represented time periods both before and after his joining Geisinger Holy Spirit.

149.   Dr. Polansky and his colleagues and superiors had full access to Medicare and Medicaid cases EHR reviewed for Holy Spirit, including appeals, as well as the full range of documents and communications (promotional materials, analytic reports, etc.) that EHR provides to all client hospitals.

150.   Defendants all had unrestricted access to comprehensive patient medical records, utilization review records, UR Plans, UR and Compliance Committee records, billing records, comprehensive claims data, internal reports, appeal records, and the EHR contracts.

151.   On April 30, 2014, within weeks of elimination of his position, Dr. Polansky sent Dr. Torchia, the Geisinger Health System Chief Medical Officer, an email with an attached spreadsheet memorializing the results of his assignment to assess the integrity of EHR's concurrent review and appeals services. This followed informal conversations with Dr. Torchia and other Geisinger Health System executives such as the Utilization Review Director, the Compliance Director, and the CFO regarding the analysis. Dr. Polansky's colleagues in general agreed with his concerns. After substantial review, Dr. Polansky concluded that the risks and costs of continuing the EHR contract

were substantial and recommended that Geisinger Holy Spirit mobilize quickly to terminate that contract. Geisinger Holy Spirit did not terminate its contract with EHR at that time, apparently preferring revenue over complying with Medicare and Medicaid requirements. Moreover, Dr. Polansky is not aware of any consideration by any Geisinger entity to self-disclose to the Government or to return payments based on false claims.

## VI.   Defendants had Access to Comprehensive Information about EHR's Fraudulent Scheme on the EHR Client Portal

152. "EHR Exchange," a comprehensive and detailed online repository for each EHR client hospital's concurrent reviews and appeals, was available to the Defendants. EHR Exchange included data that tracked treating physicians' cooperation with EHR Physician Advisors, including changing orders that deviated from EHR Certifications. These reports allowed hospitals like Defendants Geisinger Medical Center, Geisinger Holy Spirit, and Geisinger Community Medical Center to further their fraudulent scheme by policing treating physicians who resisted EHR dictating hospital status.

153. An example of one such EHR Exchange standardized tracking report was titled "Telephonic Concurrent Physician Contacts Holy Spirit Hospital January 2014." This report lists all of the Medicare cases for which EHR Physician Advisors contacted the Geisinger Holy Spirit treating physician during the month of January 2014. For each case, EHR identifies

the Geisinger Holy Spirit treating physician and describes EHR's Physician Advisor's contact with that treating physician. The report describes each treating physician as "extremely cooperative," "cooperative," or "uncooperative," as well as details about order changes. These reports were designed to enable EHR client hospitals to ensure that treating physicians would cooperate and conform their orders to EHR's inpatient certifications—even if that required them to change their own initial orders or pressured them to retain inpatient orders that violate Medicare requirements.

## VII.  Defendants Knowingly Presented False Claims for Payment to the Government

154.    The Hospital Defendants adopted EHR's policies and practices. As part of this they sent thousands of cases to EHR that failed the hospitals' criteria for inpatient services. Geisinger Holy Spirit, for example, sent 540 Medicare cases to EHR for review during the twelve months between February 2013 and January 2014 (averaging about 45 cases per month), in excess of the 40 cases per month required in the EHR contract. In prior years Geisinger Holy Spirit sent even greater numbers of Medicare cases to EHR (for example approximately 800 cases in 2010). The EHR contract required that Geisinger Holy Spirit pay for at least 40 cases per month. Geisinger Community Medical Center, for its part, sent over 300 cases to EHR in 2010 (including 276 Medicare cases and 55 commercial cases).

78

155.   The following example is illustrative of the false claims Defendants submitted for minor procedures.   Cardiac catheterization with or without cardiac stenting is one of the most frequent outpatient interventional cardiology procedures done in EHR client hospitals.   It is not on the Medicare Inpatient-Only List and is a routine outpatient procedure.   Patients are with rare exception discharged on the day of the procedure or the morning after.

156.   Claim A is for a 67-year-old Traditional Medicare patient with hypertension, rheumatoid arthritis, osteoarthritis, and bradycardia with symptoms of dyspnea who had an abnormal stress test and presented to Geisinger Holy Spirit for an elective cardiac catheterization.   He was admitted on May 8, 2012 and was discharged to home on May 9, 2012.   The treating physician was David Chang.   Patient A underwent an uncomplicated catheterization in which single vessel coronary artery disease was found and he underwent percutaneous coronary intervention (PCI), which included stenting and cutting balloon angioplasty. Based on a reasonable expectation that the patient would have an uncomplicated procedure and require less than 24 hours of hospital services, Medicare required that the case be classified and billed as an outpatient surgery.   The patient or the planned stent procedure had no unique characteristics supporting the reasonable expectation of a predicted length of hospital services of greater than 24 hours.   Furthermore, given that

79

he underwent an uncomplicated PCI, there was no reason post procedure to order observation services or change his status to inpatient. However, the EHR Physician Advisor, Dr. Colleen Coughlin, mechanically applied EHR's High Risk/Low Risk checklists for an elective percutaneous cardiac evaluation, identified the patient as high risk, and certified the patient as inpatient. EHR provided an inpatient Certification on May 8, 2012, and Geisinger Holy Spirit billed the claim for inpatient services to Medicare.

157. In August 2012, Novitas, the Medicare Administrative Contractor, requested medical records for 20 randomly selected short stay cardiac stents. Novitas identified Geisinger Holy Spirit as having a high rate of short stay inpatient claims for cardiac stents. The post-pay review identified a 75% error rate. Patient A was one of those short stay cardiac stent cases retrospectively denied as not medically necessary. Geisinger Holy Spirit was provided with a range of Medicare educational materials on hospital status requirements and warned to improve billing practices. EHR appealed the denial of the Patient Claim for $8800 and the appeal was denied. The payment for this minor procedure is billed according to Medicare requirements as Medicare Outpatient Surgery. The payment for an outpatient stent procedure is thousands of dollars less than the inpatient rate.

158.  Geisinger Holy Spirit had also been audited by Highmark Medicare Medical Services, the Medicare Administrative Contractor that conducted hospital status medical record reviews prior to Novitas, for short stay inpatient carotid artery angiography claims.  This audit was done prior to Dr. Polansky joining Geisinger Holy Spirit.   Dr. Polansky was told by Geisinger Holy Spirit senior management that the majority of these claims were denied.  Carotid angiography (injecting die into the carotid arteries in the neck to evaluate the anatomy) is a routine outpatient procedure.  The vast majority of patients do not have complications that would even require ordering observation services and are discharged the same day or the day after the procedure.

159.  In contrast, short stays are not expected for procedures to **unblock** the carotid arteries (angio*plasty*) and the required hospital status for those procedures is inpatient.  Procedures like carotid angio*plasty* are on the Medicare Inpatient Only list and can only be paid as an inpatient claim.

160. Claim A is a false claim that violates multiple Medicare requirements that Geisinger Holy Spirit certified compliance with in its claims submission, including (1) permitting a billing vendor to dictate medical necessity, (2) submitting a hospital claim without a compliant UR Committee and UR Plan, and (3) submitting an inpatient claim that fails to meet

81

Medicare's inpatient medical necessity requirements, including specifically the 1981 Medicare Hospital Manual instructions for minor procedures, *see* 1981 Medicare Hospital Manual, Ch. 210.

161.    The following illustrative claim is an example of a chest pain case, which in general is the most frequent type of case referred by EHR client hospitals. Chest pain was one of the first case types for which Medicare and Medicaid introduced payments for observation services. This was to increase hospital and physician compensation for evaluating and treating patients to determine whether the patient was having an acute cardiac event. Absent a life-threatening condition these patients are discharged after a short hospital stay.

162.    Claim B was submitted by Holy Spirit to Pennsylvania Medical Assistance for a 55-year-old woman with a past medical history of hypertension, migraines, and a prior negative exercise stress test for coronary artery disease. She presented to the Geisinger Holy Spirit emergency room on December 4, 2012 with chest pain. Diagnostic evaluation (including EKGs, cardiac enzymes, and a chest CT) revealed no acute condition requiring ongoing hospitalization, and she was discharged to home the following day (December 5, 2012). EHR certified the patient as high-risk requiring inpatient

services and the claim was billed accordingly.    Pennsylvania Medical
Assistance denied the claim and confirmed the denial when EHR appealed.

163.   Not only was there was no determination of the expected
duration of medically necessary hospital services required, but the patient was
characterized with boiler plate and fake science arguments as high risk.  Chest
pain is a symptom, and the vast majority of patients with this finding are not
in the midst of a cardiovascular event.  It is not possible to reasonably and
reliably forecast duration of hospital services until key diagnostic findings
such as cardiac enzymes become available.   Medical necessity for this
Pennsylvania Medical Assistance patient was for observation services, not
inpatient services, as there was no reasonable expectation of greater than 24
hours of hospital services.

164.   Claim B is a false claim that violates multiple Medicaid
requirements that Geisinger Holy Spirit certified compliance with in its claims
submission, including (1) a billing vendor dictating medical necessity criteria,
(2) submitting a hospital claim without a compliant UR Committee and UR
Plan, and (3) submitting an inpatient claim that fails to meet Medicaid's
inpatient medical necessity requirements.

165.   Exhibit A is a list of representative cardiac stent cases from
Geisinger Community Medical Center and Geisinger Holy Spirit in 2010 that

were certified as inpatient by EHR and, as alleged above, in almost all were billed according to the EHR Certification. These cases illustrate the pattern and practice of Defendants submitting false inpatient professional and facility claims for minor procedures. Such minor procedures are not expected to result (and in fact do not routinely result) in medically necessary hospital stays of more than 24 hours (or two midnights after October 2013), so these cases with rare exception required ordering and billing outpatient surgery professional and facility services.

166.   Exhibit B is a list of representative short stay inpatient claims for pacemakers and automated implantable cardioverter defibrillator (AICD) cases submitted by Geisinger Holy Spirit in 2013 and 2014. The claims were submitted to a range of Government and Commercial Payors. These claims illustrate the pattern and practice of Defendants submitting false inpatient professional and facility claims for minor procedures. Such minor procedures are generally not expected to result (and in fact do not routinely result) in medically necessary hospital stays of greater than 24 hours (or two midnights after October 2013), so these claims with rare exception required ordering and billing outpatient surgery professional and facility services.

167.   Exhibit C is a list of representative inpatient claims for short stay urgent and elective cases submitted by Geisinger Holy Spirit in 2013 and 2014.

The claims were submitted to a range of Government and Commercial Payors. These claims illustrate the pattern and practice of Defendants submitting false inpatient professional and facility claims for short stay emergent and elective cases. Such cases are not expected to result (and in fact do not routinely result) in medically necessary hospital stays of more than 24 hours (or two midnights after October 2013), so these claims with rare exception required ordering and billing outpatient hospital professional and facility services.

168. Exhibit D is a list of representative inpatient claims for cases submitted by Geisinger Holy Spirit between 2010 and 2013 and targeted for review and denied payment by Pennsylvania Medicaid medical review contractors. These Pennsylvania Medicaid claims illustrate the pattern and practice of Defendants submitting false inpatient professional and facility claims. Such cases are not expected to result (and in fact do not routinely result) in hospital stays of greater than 24 hours, so these claims with rare exception required ordering and billing outpatient hospital services.

169. With rare exception, the claims described in paragraphs 165 through 168, and in exhibits A through D, violate one or more material Medicare, TRICARE or Medicaid hospital status requirements and are thus false claims.

### VIII.  Spirit Physician Services Inc. Gave Kickbacks to Doctors to Participate in the Scheme

170.   Dr. Polansky has detailed first-hand knowledge of a kickback scheme by Spirit Physician Services Inc. and Geisinger Holy Spirit to promote the submission of false inpatient and outpatient claims.

171.   Spirit Physician Services Inc. owns and operates a medical practice that includes hospitalists working at Geisinger Holy Spirit.   Spirit Physician Services Inc. designed a bonus program for the hospitalists, who are hospital-based physicians who were responsible for making hospital status decisions. At Geisinger Holy Spirit, like many hospitals, the majority of hospital status orders were not written by the patients' community-based physicians but by a group of physicians who only manage patients during their hospital course.   These physicians are called hospitalists.   Dr. Polansky was approached in 2014 by several hospitalists at Geisinger Holy Spirit, who complained to him that his compliance efforts were costing them tens of thousands of dollars annually because they were "losing" inpatient cases, and this impacted their bonus program.

172.   Dr. Polansky investigated the concern raised about potential losses in bonus compensation for achieving compliance and learned that Spirit Physician Services Inc. calculated its Hospitalist Physicians' bonuses based on the total amount of units of work.   These work units are called Relative

Value Units (RVUs). The number of units of work for a case is greater if a patient is in inpatient status than if the patient is in outpatient status receiving observation services. The higher the RVUs, the higher the reimbursement from professional claims submitted by Spirit Physician Services for payment. Therefore, the hospitalist, Spirit Physician Services, and the hospital collectively benefit from the hospitalist ordering inpatient services, *i.e.*, more inpatient orders lead to larger bonuses for hospitalists, larger reimbursements for professional claims, and larger reimbursements for hospital claims. On its face, one of the purposes of this higher bonus was to induce hospitalists to make more inpatient status orders.

173. Dr. Polansky raised with executives at Geisinger Holy Spirit the issue of hospital status orders impacting bonus compensation. He was particularly concerned that making bonus payments larger for inpatient services than for observation services was creating a financial incentive for hospitalists to write inpatient orders when the case did not meet inpatient requirements. This substantial compliance concern was discussed with management informally and formally. Dr. Polansky reached out, for instance, to Dr. Shubhra Kumar-Bradley, the physician executive in charge of the hospitalist program, and Geisinger Holy Spirit Chief Medical Officer Dr. Joseph Torchia on more than one occasion raising the need to address the

hospitalist bonus program's perverse incentives of compensating inpatient status more than outpatient status.

174.   Dr. Polansky's pleas over several months fell on deaf ears. In late April 2014, Dr. Polansky escalated his concerns with Bruce Haga, the President of Spirit Physician Services, and addressed the following email to Joseph Esposito, the administrator of the hospitalist program:

**From:** Polansky, Jesse
**Sent:** Wednesday, April 30, 2014 10:27 AM
**To:** Esposito, Joseph P
**Cc:** Kumar-Bradley, Shubhra· Torchia, Dr. Joseph
**Subject:** productivity and hospital status

Hi Joe:

Appreciate your efforts to accelerate progress on removing perverse incentives from hospital status decisions by the hospitalists.  It is a significant compliance and fairness issue.  It will be difficult to engage them in future discussions about quality and efficiency if it has significant impact on their bottom lines.

Tx,jp

175.   Dr. Polansky was forbidden from discussing his concerns about the Spirit Physician Services hospitalist bonus program or similar programs at other Geisinger Hospitals with other Geisinger colleagues or the Geisinger due diligence team on site at the Holy Spirit campus.  No changes were made to the bonus program, and Dr. Polansky's position was eliminated soon after sending this last email.

176.  Spirit Physician Services Inc. knowingly conspired with Geisinger Holy Spirit to cause the submission of false physician and hospital inpatient claims for reimbursement in part because of Spirit Physician Services Inc.'s inducement to the hospitalists.  Spirit Physician Services Inc.'s inducements to hospitalists to make inpatient status orders thus constituted unlawful kickbacks in violation of federal law.  When Spirit Physician Services Inc. submitted inpatient claims for the hospitalists, they certified on CMS-1500 forms that the claims "compl[y] with all applicable laws . . . including but not limited to the Federal anti-kickback statute."  When Geisinger Holy Spirit submitted inpatient claims for reimbursement, it certified on CMS-1450 forms that they understood that "misrepresentation or falsification of essential information as requested by this from may serve as the basis for civil monetary penalties and assessments . . . under federal and/or state laws."  All claims for payment to the government tainted by these illegal kickbacks would not have been paid had the Government known of the illegal kickbacks.  These claims for payment thus constitute false claims.  42 U.S.C. §1320a-7b(g).

## IX.    The High Cost to the Government of Hospitals and Physicians Billing False Inpatient and Observation Claims

177.  The payments that government programs make to reimburse hospitals and physicians are in general substantially higher for services billed

as inpatient services versus outpatient observation hospital services. Inpatient and outpatient observation services are indistinguishable in scope and intensity. In addition, billing for observation services when the patient's evaluation and treatment is only payable as outpatient emergency room services creates significant additional payment for services that are not medically necessary.

178. For government programs, hospital inpatient services are covered under Hospital Insurance (for Medicare this is called Part A). Hospitals are reimbursed for an inpatient stay based on the patient's diagnosis, which is categorized by its Diagnosis Related Group ("DRG"). The hospital in most cases receives the same reimbursement amount regardless how many days the patient happens to remain in the hospital.

179. For government programs, hospital outpatient observation services, along with other outpatient hospital services, are covered under Medical Insurance (for Medicare this is called Part B). In calculating payment rates for outpatient services, Medicare utilizes the Outpatient Prospective Payment System. All outpatient services paid under the OPPS are classified into groups called Ambulatory Payment Classifications ("APC").

180. For example, according to EHR, Medicare generally pays about $4,000-$5,000 more for inpatient services under the DRG system than it does

when the same services are provided to a patient classified as observation (such that the APC classifications apply). The disparity between DRG and APC payments grows especially large when short hospital stays, especially for minor procedures, are involved. Consequently, there are strong financial incentives for hospitals to violate government hospital status requirements and wrongly bill cases as inpatient.

181. The costs to the government of Defendants filing claims for false inpatient and observation services are not limited to hospital billings, but also extend to separate billings for physicians who provide analogous professional services to patients. For the government programs, professional services (such as physician services) are not billed as part of DRGs under hospital insurance (for Medicare under Part A), but rather are billed under medical insurance (for Medicare under Part B). Professional services are billed using Evaluation and Management Codes, there are separate codes to designate the services performed for inpatients rather than outpatients, and the payments to the physicians are significantly higher under the inpatient codes.

182. The Defendants' fraud related to hospital status also led to the submission and payment of thousands of false professional and hospital claims to government contractors such as commercial insurance companies

that administer Medicare Advantage Plans and Pennsylvania HealthChoices Plans.

183.   The false claims submitted for hospital services also defrauded Medicare as a Secondary Payor (MSP).   Medicare as a Secondary Payor describes the situation when the Medicare program does not have primary payment responsibility.  In these situations, Medicare has responsibility to pay a portion of the remainder of any claim that is not covered by the beneficiary's primary payor.   In general, when Medicare is the secondary payor the government relies on the hospital status of the claim as paid by the primary payor.   Therefore, if a false inpatient claim is paid by the commercial insurance plan, Medicare is subsequently defrauded as it pays its share of the more expensive inpatient service.

184.   The fraud on traditional Medicare also impacted government payments to Medicare Advantage organizations.   Medicare payments for Medicare Advantage plans are based on the cost structure of the traditional Medicare program.   The Defendants by adopting billing vendor EHR's fraudulent policies and practices increased the cost structure of the traditional Medicare program, which in turn caused fraudulent claims and increased payments to Medicare Advantage plans.

## FIRST CAUSE OF ACTION

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

185.   Plaintiff repeats and re-alleges the paragraphs above as if fully set forth herein.

186.   From at least 2010 through 2015, and on information and belief to the present day, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, whether it be to a traditional government program like Medicare or a government program administered by a commercial insurance company like a Medicare Advantage Plan.   Specifically, Defendants submitted physician and hospital claims for payment that were false because they sought payments for inpatient or observation services, when the patients did not meet Medicare, TRICARE, or Pennsylvania Medical Assistance medical necessity, Utilization Review, or physician order requirements.   Defendants had actual knowledge of the medical necessity, Utilization Review, and treating physician order requirements, or at least recklessly disregarded or were deliberately ignorant of these requirements.

187.   From at least 2010 through 2015, and on information and belief to the present day, Defendants also knowingly caused the presentation and payments of falsely inflated claims by Medicare Advantage Plans to the

Centers for Medicare & Medicaid Services by substantially increasing the cost structure of traditional Medicare by submitting thousands of false physician and hospital inpatient and observation claims.

188.   The United States paid or authorized full or partial payment of these false claims and the United States was thereby damaged.

## SECOND CAUSE OF ACTION

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

189.   Plaintiff repeats and re-alleges the paragraphs above as if fully set forth herein.

190.   From at least 2010 through 2015, and on information and belief to the present day, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States whether it be to a traditional government program like Medicare or a government program administered by a commercial insurance company like a Medicare Advantage Plan.   This included Defendants certifying at enrollment and claims submissions compliance with relevant government program requirements.   Furthermore, the Defendants created false patient medical records and other records and statements as part of the fraudulent scheme to submit false inpatient and observation hospital and physician claims that did not meet government

program medical necessity, Utilization Review, or treating physician order requirements.   Defendants had actual knowledge of the falsity of these statements and records and that they would be used to make false claims for payment, or at least recklessly disregarded or were deliberately ignorant of the truth.

191.   From at least 2010 through 2015, and on information and belief to the present day, in doing the above, Defendants also knowingly caused the presentation and payments of false claims by Medicare Advantage Plans to the Centers for Medicare & Medicaid Services by substantially increasing the cost structure of traditional Medicare by submitting thousands of false physician and hospital inpatient and observation claims.

192.   The United States paid or authorized full or partial payment of these false claims and the United States was thereby damaged.

### THIRD CAUSE OF ACTION

**Violation of Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

193.   Plaintiff repeats and re-alleges the paragraphs above as if fully set forth herein.

194.   Defendants conspired with their billing vendor, EHR, and their treating physicians to defraud the government by getting false or fraudulent claims allowed or paid, or to commit violations of 31 U.S.C. § 3729(a)(1)(B)

(since June 7, 2008).   Specifically, Defendants together with these co-conspirators entered into agreements to make and use, or cause to be made or used, false claims for payment and false records or statements material to such claims or to get such claims paid, and, further, engaged in acts in furtherance of accomplishing the object of such agreements, including by Hospital Defendants' contracting with EHR and adopting the billing vendor's policies and practices.   Defendants had actual knowledge of the falsity of these claims, statements and records, or at least recklessly disregarded or were deliberately ignorant of the truth.

195.   Defendant Geisinger Holy Spirit and Defendant Spirit Physician Services Inc. likewise entered into agreements to make and use, or cause to be made or used, false claims for payment and false records or statements material to such claims or to get such claims paid, and, further, engaged in acts in furtherance of accomplishing the object of such agreements by knowingly paying or facilitating the payment of hospitalist bonuses to increase the number of inpatient services ordered.

196.   The United States paid or authorized full or partial payment of these false claims and the United States was thereby damaged.

## FOURTH CAUSE OF ACTION

**Violation of Federal False Claims Act, 31 U.S.C. § 3729 et seq., and the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b))**

197.   Plaintiff repeats and re-alleges the paragraphs above as if fully set forth herein.

198.   Defendant Spirit Physician Services Inc. knowingly and willfully offered to pay and paid renumeration to arrange for the ordering of inpatient services for which payment was made under a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2).

199.   Defendant Spirit Physician Services Inc. has caused to be presented false or fraudulent claims for payment by the United States, when it caused the submission of physician and hospital claims that were impermissibly linked to illegal renumerations under the Anti-Kickback Statute.

200.   Because of Defendant Spirit Physician Services Inc.'s conduct set forth in this Count, the United States has suffered actual damages, with the exact amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Violation of Federal False Claims Act
### 31 U.S.C. § 3729(G)

201. Plaintiff realleges and incorporates by reference the paragraphs above as though fully set forth herein.

202. Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, when they refused to return fraudulent overpayments to the Government despite knowledge of numerous false claims.

203. Because of Defendants' conduct set forth in this Count, the United States has suffered actual damages, with the exact amount to be determined at trial.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiff Relator, on behalf of the United States, demands that judgment be entered in their favor and against Defendants as follows:

A.   Directing that Defendants, pursuant to the federal False Claims Act, pay an amount equal to three times the amount of damages proved at trial that were sustained by the United States as a result of Defendants' violations;

B.    Directing that Defendants pay penalties of not less than $5,500.00 and not more than $11,000.00 for each violation of the United States False Claims Act up to November 2, 2015;

C.    Directing that Defendants pay penalties of not less than $11,181 and not more than $22,363 for each violation of the United States False Claims Act from November 2, 2015 the present.

D.    Directing that Plaintiff Relator receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: April 10, 2020                    Respectfully submitted,

                                         By:    */s/ Meghan J. Talbot*
                                                Meghan J. Talbot (PA 322308)
                                                Jeffrey W. Golan (PA 33729)
                                                BARRACK, RODOS & BACINE
                                                3300 Two Commerce Square
                                                2001 Market Street
                                                Philadelphia, PA 19103
                                                Tel: (215) 963-0600
                                                mtalbot@barrack.com
                                                jgolan@barrack.com

                                                Stephen Shackelford, Jr. (NY 5393657)*
                                                Seth Ard (NY 4773982)*
                                                Mark Musico (NY 5238001)*
                                                Nicholas C. Carullo (NY 5598578)*
                                                SUSMAN GODFREY L.L.P.
                                                1301 Ave. of the Americas, 32nd Fl.
                                                New York, NY 10019
                                                Tel.:   212-336-8330
                                                Fax:    212-336-8340
                                                sshackelford@susmangodfrey.com
                                                sard@susmangodfrey.com
                                                mmusico@susmangodfrey.com
                                                ncarullo@susmangodfrey.com

                                                COUNSEL FOR PLAINTIFF
                                                RELATOR

                                                *PHV applications to be submitted*