## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

THE UNITED STATES OF
AMERICA ex rel. JESSE M.
POLANSKY, M.D., M.P.H.,

      Plaintiff,

      v.

GEISINGER HOLY SPIRIT, et al.,

      Defendant.

CIVIL ACTION NO. 1:20-cv-00599

(SAPORITO, J.)

## <u>MEMORANDUM</u>

This is a False Claims Act ("FCA") action brought on behalf of the United States by a *qui tam* relator, Jesse M. Polansky, M.D., M.P.H.

The relator, Dr. Polansky, is a licensed physician with broad-based Medicare, Medicaid, and commercial health insurance experience in evidence-based medicine, utilization review, and informatics. The amended complaint alleges that, after spending eight years as a senior medical officer at a federal agency, the Centers for Medicare & Medicaid Services ("CMS"), Dr. Polansky was employed in this same field by a series of private-sector employers: Executive Health Resources, Inc. ("EHR") for a two-month period between December 2011 and February 2012; Health Management Systems, Inc., for a period of months between

the fall of 2012 and the summer of 2013; Holy Spirit Health System for a six-month period between December 2013 and May 2014; Delmarva Foundation for an unspecified period during 2014; and Summit Health, for a period of months between the spring of 2015 and August 2015.

Dr. Polansky alleges that the defendants—Geisinger Holy Spirit,[1] Geisinger Community Medical Center,[2] Geisinger Medical Center,[3] and Spirit Physician Services, Inc.[4]—participated a years-long scheme to submit fraudulent claims for payment to the United States government. The gist of the amended complaint is that the defendants relied on the fraudulent policies and practices of a billing vendor—Dr. Polansky's former employer, EHR—to exploit differences in reimbursement rates for

---

[1] So named in the amended complaint. Geisinger Holy Spirit, formerly known as Holy Spirit Hospital, is a not-for-profit hospital located in Cumberland County, Pennsylvania. It became a Geisinger affiliate in 2014. It was later acquired by Penn State Health in 2020, and it is now known as Penn State Health Holy Spirit Medical Center.

[2] Geisinger Community Medical Center is a not-for-profit hospital located in Lackawanna County, Pennsylvania, operated by Geisinger Health System.

[3] Geisinger Medical Center is a not-for-profit hospital located in Montour County, Pennsylvania, operated by Geisinger Health System.

[4] Spirit Physician Services, Inc., is a not-for-profit organization that manages primary care and specialty physician practices in affiliation with Geisinger Holy Spirit. The amended complaint alleges that it is owned by Geisinger Health System.

inpatient and outpatient services, causing them to systematically bill Medicare and Medicaid for medical services provided to thousands of patients at higher inpatient rates, instead of lower outpatient rates.

"The FCA's *qui tam* provisions authorize private persons to bring civil enforcement actions on behalf of the United States and to collect a portion of damages that may be awarded if an FCA violation is proven." *United States ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 361 (D. Mass. 2018).

> The [FCA] requires a *qui tam* [relator], before proceeding with suit, to disclose to the government the information on which the claim is based. The government then has sixty days to investigate the matter and to decide whether to intervene. The government also has the option to step into the action at a later date. In either case, the relator is not entitled to a recovery under the [FCA] if the action is one which runs afoul of the jurisdictional bars contained in 31 U.S.C. § 3730(e).

*United States ex rel. Dunleavy v. Cnty. of Delaware*, 123 F.3d 734, 738 (3d Cir. 1997) (citations omitted).

The defendants here have moved to dismiss this action under one of these jurisdictional bars, the government action bar,[5] which provides

---

[5] The defendants assert several other grounds for dismissal as well, which we do not reach.

that: "In no event may a person bring [a False Claims Act *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). Although the FCA's financial incentive encourages whistle-blowing relators with genuinely valuable insider information to expose fraud, it also attracts parasitic suits based on information already known to the government. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010); *United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 271–72 (5th Cir. 2021); *Herman*, 327 F. Supp. 3d at 361. The government action bar is intended to discourage such opportunistic behavior. *See Schweizer*, 9 F.4th at 271–72; *Herman*, 327 F. Supp. 3d at 361–62. Thus, this statutory provision "must be analyzed in the context of the twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *United States ex rel. Estate of Gadbois v. PharMerica Corp.*, 292 F. Supp. 3d 570, 576 (D.R.I. 2017) (internal brackets omitted) (quoting *United States ex rel. S. Prawer & Co. v. Fleet Bank of Me.*, 24 F.3d 320, 326 (1st Cir. 1994), and *United*

States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 651 (D.C. Cir. 1994)).

The defendants contend that the instant *qui tam* action is barred because it is duplicative of a prior *qui tam* action initiated by this same relator concerning the very same allegedly fraudulent scheme, *United States ex rel. Polansky v. Executive Health Resources* (*Polansky I*), 422 F. Supp. 3d 916 (E.D. Pa. 2019), *aff'd*, 17 F.4th 376 (3d Cir. 2021), *aff'd*, 599 U.S. 419 (2023). To prevail on their motion to dismiss, the defendants must show that: (1) the instant action is "based upon" the same "allegations or transactions" involved in the prior litigation; and (2) the government "is already a party" to that prior litigation. *See Herman*, 327 F. Supp. 3d at 362.

In *Polansky I*, the relator alleged that EHR exploited a difference in reimbursement rates for inpatient and outpatient services,[6] causing its approximately 2,400 client hospitals to fraudulently bill Medicare and Medicaid by falsely designating patient admissions as inpatient when

---

[6] *See Polansky I*, 422 F. Supp. 3d at 919 n.3 (noting the relator's allegation that "Medicare generally pays about $4,000–$5,000 more for inpatient services . . . than it does when the same services are provided to a patient classified as outpatient observation").

they should have been marked as outpatient instead.[7] The relator filed
his original complaint in *Polansky I* under seal on July 26, 2012, and the
government declined to intervene on June 27, 2014. The then-operative
second amended complaint was served on EHR and other defendants.
Those defendants filed a motion to dismiss, which was denied on July 26,
2016.[8]

The parties conducted extensive discovery. This apparently
included several discovery motions, one of which resulted in the
imposition of sanctions against the relator for his belated production of a

---

[7] *See Polansky I*, 422 F. Supp. 3d at 919 n.4 ("[T]here are two
potential levels of review for a physician's initial determination of
whether a patient should be classified as inpatient or outpatient. At the
first level, a review is conducted by an internal hospital committee using
standard industry criteria. If the internal committee determines that a
patient does not qualify for inpatient designation, many hospitals then
have a physician advisor, such as [EHR], conduct a second level review.
After physician advisor review, the hospital—not the physician advisor—
submits the claim to Medicare or Medicaid. Relator alleges that [EHR],
as a physician advisor conducting second level reviews (i.e., reviewing the
determination of the internal review committee that a patient does not
qualify for inpatient status), 'knowingly misconstrued regulations when
reviewing hospital admission determinations, fraudulently certifying
'thousands upon thousands of cases' for hospitals to submit to Medicare
and Medicaid as inpatient claims rather than outpatient as
appropriate.'") (citations and internal brackets and ellipses omitted).

[8] *See generally Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d
477 (E.D. Pa. 2016).

DVD containing approximately 14,000 documents he had obtained while employed at a federal agency, CMS.[9]

While the parties were litigating that sanctions motion, the government notified them by email in February 2019 that it intended to exercise its authority under 31 U.S.C. § 3730(c)(2)(A) to dismiss the case. The parties and the government then entered into negotiations, and in May 2019 the government notified the *Polansky I* court that it did not intend to exercise its dismissal authority, provided that the relator proceeded on his claims under a significantly narrowed framework. But the government reserved its right to reevaluate whether dismissal was warranted based on future developments.

The relator then filed his third amended complaint, purportedly adhering to that narrowed framework negotiated with the government, and discovery continued. Soon, however, it became apparent that disagreements remained between the government and the relator as to the appropriate scope of the relator's claims under the narrowed criteria they had negotiated.

---

[9] The relator was also admonished regarding an attempt to unilaterally change the selection of claims for a bellwether jury trial.

In August 2019, a special master recommended that the government produce certain documents that it had withheld on the basis of the deliberate process privilege, and that it produce responsive documents for additional custodians. The government filed objections to the special master's report. The *Polansky I* court overruled the objections with respect to some of the documents, and directed the parties to provide supplemental briefing as to the rest. On August 20, 2019, apparently finding the cost of permitting the litigation to continue now outweighed its potential benefit, the government moved to dismiss the *Polansky I* action pursuant to its authority under 31 U.S.C. § 3730(c)(2)(A). On November 5, 2019, following briefing and a hearing, the *Polansky I* court granted the government's motion and dismissed the action. The dismissal was affirmed on appeal by the United States Court of Appeals for the Third Circuit on October 28, 2021, and by the Supreme Court of the United States on June 16, 2023.

While the *Polansky I* judgment was pending on appeal, the relator commenced the instant FCA action, filing his original complaint under seal on April 10, 2020. In November 2023, the government completed its investigation of the relator's claims and declined to intervene, and the

complaint was unsealed and served on the defendants. The defendants moved for dismissal of that original complaint, and the relator filed his amended complaint, which is the currently operative pleading in this matter. The defendants now move for dismissal of the amended complaint.

We are compelled to conclude that the instant action is indeed based upon the same allegations or transactions involved in the prior litigation. The amended complaint alleges the *very same* allegedly fraudulent scheme as the one at issue in *Polansky I*, except instead of being directed at EHR itself, this action is directed at a small subset of EHR's approximately 2,400 hospital clients who allegedly overbilled Medicare and Medicaid in reliance on EHR's policies and procedures. There is, frankly, very little daylight between the two cases, with the relator simply recycling many of the allegations originally asserted in *Polansky I*. *See, e.g.*, Defs.' Br. Supp. 23–27 (chart comparing allegations of *Polansky I* and the amended complaint in this case), Doc. 79; Defs.' Reply Br. 14–16 (further discussing the same), Doc. 84.

> [T]he government action inquiry is essentially a test of factual similarity. If a relator's allegations are the same as allegations already made by the government, or are similar enough to be characterized as feeding off

- 9 -

> of the government's allegations, the government action
> bar applies. By contrast, if a relator's case is seeking to
> remedy fraud that the government has not yet
> attempted to remedy, the government bar does not
> apply.

*Sturgeon v. PharMerica Corp.*, 438 F. Supp. 3d 246, 262 (E.D. Pa. 2020)

(footnote and internal quotation marks omitted).

"When considering the commonality between these 'allegations [or]

transactions,' the Court focuses specifically on the 'allegations or

transactions of *fraudulent conduct*.'" *United States ex rel. Vt. Nat'l Tel.*

*Co.*, 531 F. Supp. 3d 247, 264 (D.D.C. 2021) (quoting *United States ex rel.*

*Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 707 (7th

Cir. 2014)), *rev'd on other grounds*, 34 F.4th 29 (D.C. Cir. 2022). Thus, the

FCA's government action bar "'prohibit[s] *qui tam* actions *only* when

either the allegation of fraud or the critical elements of the fraudulent

transaction themselves' are the subject of a governmental civil action or

penalty proceeding." *Absher*, 764 F.3d at 707–08 (quoting *Quinn*, 14 F.3d

at 654); *cf. Dunleavy*, 123 F.3d at 740 ("It is clear that the FCA's reference

to 'allegations or transactions' is in the disjunctive, so that disclosures

which reveal either the allegations of fraud or the elements of the

underlying fraudulent transaction are sufficient to invoke the

jurisdictional bar.") (considering the FCA's public disclosure bar under

§ 3730(e)(4), which uses the same "allegations or transactions" language).

> If an allegation of fraud has already been made, the
> analysis is straightforward. But even if no allegation of
> fraud has been made, the [§ 3730(e)(3) government
> action bar] may still apply so long as facts disclosing
> the fraud itself are in the government's possession . . . .
> In this latter case, the court must determine whether
> facts establishing the essential elements of fraud—
> and, consequently, providing a basis for the inference
> that "fraud has been committed"—are in the
> government's possession . . . .

*Absher*, 764 F.3d at 708 (quoting *Quinn*, 14 F.3d at 654). As the Third

Circuit has recognized, "the inference of fraud requires recognition of but

two elements: 'a misrepresented state of facts and a true state of facts.'"

*Dunleavy*, 123 F.3d at 741 (quoting *Quinn*, 14 F.3d at 655).

Here, we are presented with a "straightforward" case under the

government action bar. It is beyond dispute that the prior FCA action,

*Polansky I*, alleged a fraudulent scheme in which EHR and its

approximately 2,400 hospital clients sought to defraud the United States

by overbilling Medicare and Medicaid for medical services provided to

thousands of patients, misclassifying them as inpatient services rather

than less remunerative outpatient services. The instant FCA action

simply asserts these very same *allegations* of fraud against three of those

2,400 hospital clients, alleging that the three hospital defendants in this case utilized EHR and its allegedly fraudulent billing policies and procedures to submit a subset of the very same allegedly fraudulent transactions—the submission of allegedly fraudulent claims for payment to Medicare and Medicaid—that were at issue in *Polansky I*.[10]

The relator argues that the instant action nevertheless is not "based upon" the *Polansky I* action because it involves different defendants,[11] and thus seeks to "remedy fraud that the government has not yet attempted to remedy," *see Sturgeon*, 438 F. Supp. 3d at 262. But this argument by the relator is based on a false premise—the fraud

---

[10] Indeed, although it was not named as a defendant in that action, factual allegations about the billing practices and conduct of Geisinger Holy Spirit were specifically and extensively pleaded in the *Polansky I* complaint, holding Holy Spirit out as an exemplar of EHR hospital clients. These facts apparently were known to Dr. Polansky because he was employed by Holy Spirit as a physician advisor for a six-month period prior to its affiliation with Geisinger Health Systems.

[11] In *Polansky I*, the named defendants included EHR, several of its corporate parent companies, and two of EHR's client hospital systems located in California and Connecticut. Although it was not a named defendant, the *Polansky I* complaint included extensive factual allegations regarding the conduct and practices of Holy Spirit, as observed by Dr. Polansky while employed there. Although not specifically identified in the *Polansky I* complaint, based on the facts alleged in this case, Geisinger Community Medical Center and Geisinger Medical Center were evidently among the 2,400 hospital clients of EHR described in the *Polansky I* complaint.

alleged in the *Polansky I* case is the very same fraud alleged in this case, and thus this case seeks to remedy the very same fraud as the earlier one. In *Polansky I*, it was alleged that EHR conducted second-tier utilization reviews for its approximately 2,400 hospital clients— including the three hospital defendants named in this case—reversing internal review committee decisions that patients did not qualify for inpatient status. It was alleged that EHR misconstrued applicable federal regulations to certify thousands of such cases to permit its hospital clients to submit those claims to Medicare and Medicaid as inpatient claims. In this case, the three hospital defendants are alleged to have relied on EHR and its billing practices and procedures to conduct these same utilization reviews, obtaining allegedly fraudulent certifications for hundreds of cases, which they then submitted to Medicare and Medicaid for payment as inpatient claims. This second FCA action merely shifts the target of litigation from EHR itself to three of its hospital clients who actually submitted some of those same allegedly fraudulent EHR certifications in support of their claims for payment to

Medicare and Medicaid.[12] Thus, it is clear to the court that, irrespective of the particular defendants named in the instant amended complaint, the instant FCA action is based upon the very same allegations or transactions as those involved in *Polansky I. Cf. United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 514 (6th Cir. 2009) (where the primary focus of fraud allegations in a *qui tam* FCA action were contained in a prior lawsuit, the *qui tam* action was based on the same allegations or transactions, despite the inclusion of additional factual detail and different or additional defendants in the second action) (considering the FCA's public disclosure bar under § 3730(e)(4), which uses the same "allegations or transactions" language), *abrogated on other grounds by United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021); *United States ex rel. Sonnier v. Standard Fire Ins. Co.*, 84 F. Supp. 3d

---

[12] The amended complaint in this second FCA action adds some factual allegations to suggest that officials at Holy Spirit knew that the billing practices at issue were questionable, but the fraudulent scheme itself remains the same as in the prior FCA action against EHR. It also adds a non-hospital defendant affiliated with Holy Spirit Hospital, Spirit Physician Services, Inc., which allegedly participated in this very same fraudulent scheme, benefiting from Holy Spirit Hospital's systemic misclassification of patients as inpatients rather than outpatients, which in turn permitted the physician group to bill related physician services to Medicare at higher inpatient rates as well.

575, 590 (S.D. Tex. 2015) (same).

The relator further argues that the government action bar does not apply to this case because, at this point, the government is no longer a party to *Polansky I*, as that case has been dismissed by final order.[13] The relator points to the language of the statute, which uses the present tense in referring to the government's status as a party to the prior action, contending that the government ceased to be a party to the *Polansky I* action when that action was dismissed. *See* 31 U.S.C. §3070(e)(3) (barring a later FCA action "based upon allegations or transactions which *are* the subject of a civil suit . . . in which the Government *is* already a party") (emphasis added). But "[t]he opposite conclusion comports more with the reality of litigation: a person remains a party to his suit, even after the suit's conclusion." *United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1017 (9th Cir. 2017). Unlike a neighboring provision—the FCA's first-to-file bar, 31 U.S.C. § 3730(b)(5)—the statutory language of the FCA's government action bar contains no language to suggest any limitation to *pending* actions. *Compare*

---

[13] "At this point" because *Polansky I* was still pending on appeal at the time when the original complaint in this second FCA action was filed.

§ 3730(b)(5) ("[N]o person other than the Government may . . . bring a related action based on the facts underlying the *pending* action.") (emphasis added), *with* § 3730(e)(3) ("In no event may a person bring [a False Claims Act *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."); *see also Bennett*, 876 F.3d at 1018 ("Congress could have utilized the term 'pending' to express the intention for § 3730(e)(3) to lose effect once the prior action was dismissed."); *Gadbois*, 292 F. Supp. 3d at 579 ("Had Congress wanted the government action bar to have the same reach as the pending case bar, it likely would have included [the word "pending."]"). Indeed,

> [i]f the reading of the statute were as the [relator] suggests, such that a government action bar dissolves whenever a suit in which the Government is a party is dismissed, the central policies behind the government action bar would be undermined. For example, after the Government is made aware of, investigates, intervenes in, and settles a *qui tam* suit, subsequent original source relators . . . could allege the same fraud, bring identical lawsuits, and bring no additional benefit to the Government except the recovery of additional funds. This would be plainly contrary to the purpose of the government action bar: to promote the exposure of additional fraud while weeding out duplicative suits the Government is capable of

pursuing on its own. Where the Government already has been party to a suit based on the same allegations, the Government is clearly capable of pursuing the suit itself, and the government action bar should prohibit these duplicative successor suits.

*Gadbois*, 292 F. Supp. 3d at 580; *see also Bennett*, 876 F.3d at 1016 ("Both common sense and statutory language demonstrate that the Government remains a 'party' even after the cessation of its enforcement action. . . . [T]he government-action bar applies even when the Government is no longer an active participant in an ongoing *qui tam* lawsuit."). Thus, we find the government action bar applicable to this case, despite the ultimate dismissal of *Polansky I*.

Finally, the relator argues that the government action bar is limited to allegations or transactions in a prior suit *pleaded by the government itself*, rather than a *qui tam* relator. But that proposition finds no support in the statutory language of the government action bar, which contains no such restriction, providing only that a *qui tam* FCA action is jurisdictionally barred if it is "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party," 31 U.S.C. § 3730(e)(3).

In support of his argument, the relator cites to *dicta* in three case

law decisions: (1) *United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 328 (1st Cir. 1994); (2) *United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667 (8th Cir. 1998); and (3) *United States ex rel. International Brotherhood of Electrical Workers, Local Union No. 98 v. Farfield Co.*, No. 09-4230, 2013 WL 3327505 (E.D. Pa. July 2, 2013).

In *Prawer*, the First Circuit considered a *qui tam* FCA action involving the acquisition by the Federal Deposit Insurance Corporation ("FDIC") of certain promissory notes issued by an insolvent company, S. Prawer & Co. ("Prawer").

In July 1991, serving as a receiver, the FDIC supervised a transfer of assets from a defunct bank to Fleet Bank of Maine ("Fleet"). The contract between the FDIC and Fleet—the "Assistance Agreement"— provided that Fleet had the right to "put," or cause the FDIC to repurchase, any loans acquired by Fleet from the defunct bank. Among the assets transferred to Fleet from the defunct bank were five promissory notes given to the defunct bank by Prawer, representing $1.1 million that Prawer had drawn against a $2 million line of credit issued by the defunct bank. Prawer entered into a new agreement with Fleet for

a $2 million line of credit. Prawer drew upon this new line of credit to fully satisfy its obligations under the original notes, and it continued to draw on that line of credit. By May 1992, Prawer had drawn $1.6 million against its $2 million line of credit with Fleet, represented by seven promissory notes. On May 1, 1992, Prawer informed Fleet that it had sold virtually all its assets to another company. On May 6, 1992, Fleet exercised its right under the Assistance Agreement's put-back provision to cause the FDIC to purchase the $1.6 million in Prawer promissory notes. In November 1992, the FDIC brought an action against Prawer and other defendants, seeking to collect upon the notes put back to it pursuant to the Assistance Agreement. It also alleged that the sale of Prawer's assets was a fraudulent conveyance because Prawer had been insolvent and peddled its assets for less than full value to settle debts to certain creditors. After responding to the FDIC's complaint, Prawer filed a third-party complaint against Fleet and one of its subsidiaries, asserting that the notes were not putable under Fleet's contract with the FDIC. The collection case was settled before the court issued a ruling on any of the parties claims and defenses. *See Prawer*, 24 F.3d at 323.

In June 1993, the *Prawer* relators filed a *qui tam* FCA action,

alleging that Fleet, a corporate subsidiary of Fleet, a law firm and individual lawyers that represented Fleet and its subsidiary, and an FDIC staff attorney had created and used false records and statements to cause the government to pay Fleet $1.6 million for the Prawer notes pursuant to the put-back provisions of the Assistance Agreement. Shortly after it was filed, the *qui tam* action was dismissed by the court *sua sponte*, relying on the government action bar. *Id.* at 323–24.

On appeal, however, the First Circuit reversed the district court's decision, concluding that the *qui tam* action was not "parasitic" of the prior collection action—i.e., the *qui tam* action before it was not based upon allegations or transactions of fraudulent conduct that were the subject of the earlier collection action. The appellate court identified two facts that combined to compel its decision. First, the appellate court noted that the earlier collection case brought by the FDIC did not involve any claims whatsoever by the FDIC against Fleet or the other *qui tam* defendants, much less fraud claims against them.[14] Second, the appellate

---

[14] As noted above, the FDIC's prior action sought to collect on the notes put back to it by Fleet. The only fraud alleged was the fraudulent conveyance of assets from an insolvent Prawer to another company for less than full value. The *qui tam* action was based on an entirely separate

*(continued on next page)*

court noted that the two cases involved entirely different transactions—the *qui tam* action involved Fleet's put-back of the Prawer notes pursuant to its contract with the FDIC, and the collection action involved Prawer's making of the notes and alleged failure to satisfy them. In *dictum*, the appellate court contrasted the case before it against the prototypical case it imagined Congress had in mind when it drafted the government action bar: "i.e., a *qui tam* action based upon allegations or transactions *pleaded by the government* in an attempt to recover for fraud committed against it." *Id.* at 328.

The relator primarily relies on an Eighth Circuit decision, *Costner*, which quoted this *dictum* in *Prawer* out of context, refashioned into a more restrictive rule by adding the word "only," for reasons that are unclear. *See Costner*, 153 F.3d at 676 ("[T]his section will typically bar only a '*qui tam* action based upon allegations or transactions pleaded *by the government* in an attempt to recover for fraud against it.'"). But, as in *Prawer*, this observation by the *Costner* court was *dictum*. *Costner* involved a *qui tam* FCA action against various contractors based upon

_____

and distinct allegation of fraudulent conduct by Fleet and others involved in Fleet's exercise of the put-back provision.

allegations of fraud involving the submission of false claims for payment for environmental remediation work completed at a particular Superfund site. *See id.* The defendants sought dismissal under the government action bar, pointing to a long history of federal and state litigation and administrative proceedings involving the assessment of liability for the cost of environmental remediation at that same Superfund site. *See id.* at 671–73. The appellate court rejected that argument, holding that the *qui tam* false claims action simply was not based upon any allegations or transactions of fraudulent conduct that were the subject of these prior environmental cleanup liability proceedings. *See id.* at 676.

The *ratio decidendi* of both of these out-of-circuit opinions was the same: a *qui tam* FCA action cannot be precluded under the government action bar where the allegations or transactions of fraudulent conduct upon which the *qui tam* action is based were simply not present in earlier litigation or administrative proceedings. The passages relied upon by the defendants in this case are *obiter dictum*.

The relator also cites an Eastern District of Pennsylvania case, *Farfield*, in support of his argument. While the *Farfield* court referenced the *Costner dictum* in passing, quoting it in summarizing the FCA's

government action bar, *see Farfield*, 2013 WL 3327505, at \*9 ("This section will typically bar only a *qui tam* action based upon allegations or transactions pleaded by the government . . . .") (ellipses in original) (quoting *Costner*, 153 F.3d at 676), the *Farfield* court's recitation of the *Costner* rule is itself *dictum* as well, playing no role whatsoever in the *Farfield* court's ultimate determination that the *qui tam* complaint before it simply did not rely on the same facts and evidence included in an earlier U.S. Department of Labor ("DOL") investigation.[15] *Id.* \*12–13.

Thus, we find the relator's argument on this final point unpersuasive and entirely unsupported by the statutory text of § 3730(e)(3).

Accordingly, we find that our exercise of jurisdiction in this *qui tam*

---

[15] In *Farfield*, the relator alleged that the defendant contractor systematically misclassified a significant number of its workers on federally funded transit projects for the purpose of paying those workers a lower wage than required by federal labor laws, permitting it to underbid competitors. The defendant argued that the *qui tam* action was precluded by the government action bar, pointing to an earlier DOL audit, in which the only violation found was the underpayment of holiday wages to four employees who performed carpentry work over a holiday weekend. *Farfield*, 2013 WL 3327505, at \*11. Ultimately, the *Farfield* court concluded that government action bar did not apply because, although the *qui tam* action and the prior DOL investigation involved some similar underlying facts, the earlier investigation did not involve any allegations or transactions of fraudulent conduct at all. *Id.* at \*12–13.

FCA action is precluded by the government action bar, 31 U.S.C. § 3730(e)(3), as it is based upon allegations or transactions of fraudulent conduct which are the subject of a prior civil suit in which the government is already a party, *Polansky I*. The defendants' motion to dismiss will be granted and this action will be dismissed for lack of subject matter jurisdiction.

An appropriate order follows.

Dated: April 30, 2025                 *s/Joseph F. Saporito, Jr.*
                                      JOSEPH F. SAPORITO, JR.
                                      United States District Judge